**FAIRMONT FOODS COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 72–1283.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1972.

Decided Dec. 21, 1972.

Harry L. Browne, Kansas City, Mo., for petitioner.

Leonard M. Wagman, Atty., N.L.R.B., Washington, D. C., for respondent.

Before MATTHES, Chief Judge, ROSS, Circuit Judge, and VAN PELT, Senior District Judge.

ROSS, Circuit Judge.

Fairmont Foods Company (Fairmont) petitions this Court to review and set aside an order of the National Labor Relations Board (Board), 196 N.L.R.B. No. 122, 80 L.R.R.M. 1172 (1972), wherein the Board found Fairmont in violation of §§ 8(a)(5) and (1) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(5) and (1). The Board has cross-applied for enforcement. We deny enforcement of that order.

This case involves the right of an employer (Fairmont) to withdraw from a multiemployer bargaining unit after negotiations have begun but before an agreement has been reached. Two central issues are raised by Fairmont. The first is whether there is substantial evidence on the record as a whole to support the Board's finding that no impasse had been reached in negotiations between the multiemployer bargaining unit, of which Fairmont was a member, and the Teamsters Local 471 (Union), and thus that Fairmont's withdrawal was untimely. The second is whether there is substantial evidence to support the Board's finding that the Union did not consent to Fairmont's withdrawal.

Fairmont has had a collective bargaining relationship with the Union since 1957. Its 1965–1967 and 1967–1969 contracts were negotiated as a member of the Minneapolis Milk Dealers Association. In negotiations for the 1969–1971 contract, however, Fairmont bargained separately in an unsuccessful attempt to eliminate the wholesale load restrictions present in the contracts negotiated by the Association.

These load limits, which were based upon units representing a quantity of dairy products, were set at a 3,500 unit per day average. Fairmont believed that because of these limits, it was prevented from delivering a commercially adequate volume of dairy products, thereby placing it at a "severe competitive disadvantage." Prior to collective bargaining for the contract term beginning May 1, 1971, Fairmont made its position regarding elimination of load limits clear to the Union.

It likewise made its position clear to the Association members, who agreed they would insist on eliminating the load limits from the 1971–1973 contract if Fairmont would rejoin the group. As a result, Fairmont authorized, by letter, the Association's negotiating committee to negotiate on its behalf, but expressly refused to be committed to any particular contract provision "prior to our specific approval." This reservation of authority was not communicated to the Union prior to an agreement being reached.

Formal negotiations commenced on March 30, 1971, when the Association's proposals, including the elimination of load limits, were presented to the Union. Six subsequent meetings were held, but very little was agreed upon. The last of these meetings occurred on April 30, the contract termination date. Both state and federal mediators were present, as

they had been for several previous meetings. Moran, the union representative, testified that by approximately 11:30 p. m. "we knew that we were so far apart, we couldn't reach an agreement by midnight." Consequently, he sent the union committee members back to the union office to prepare for a strike. Moran and another union representative "stayed there to continue the negotiations, if any."

The testimony regarding subsequent transactions is somewhat conflicting, but it does show that the Union and Association were still apart on at least fifteen issues after midnight. Moran told the negotiating committee that he would be in his office that afternoon. He left, and the Union struck the employer-members' plants at 2:00 a.m. That afternoon, May 1, Hadlick, the Association's chief negotiator, accompanied by the mediators, delivered a "best and final" offer to Moran at his office. This offer contained a compromise by raising the load limits from 3,500 units to 5,500 units, or in the alternative an hourly rate with only two stops; however, it was rejected by the Union.

On May 2 and 3 the Union negotiated separately with three individual employer-members, who were then allowed to resume operations. The load limits set by these agreements, two of which were oral and one of which was written, remained at 3,500 units "unless changes were made in negotiations with the Minneapolis Milk Dealers Assn."

In response to an attempt by the mediators to arrange a meeting with the Union on May 3, the multiemployer group met. Several members indicated a willingness to reach an agreement with the Union as three had already done. Fairmont, ·however, refused to compromise on the load limit issue and withdrew from negotiations. During a series of meetings with the Union that evening, Hadlick told the union representative, Moran, that Fairmont "had 'walked out' of the negotiations and that they refused to be bound by the terms of any collective-bargaining agreement

that might be negotiated." Moran was also informed that Fairmont was still a member of the Association, but he conceded that this meant it would pay its share of the negotiation expenses.

At about 3:30 a.m. on May 4, the 1971–1973 contract was signed by the Union and all members of the Association except Fairmont. The load limit finally agreed upon was a compromise between the earlier positions of both the Union and the Association.

Later that day, the labor relations manager of Fairmont indicated to Moran by telephone a willingness to meet with the Union to negotiate an agreement. Meetings were held on May 5, 7 and 10; Fairmont refused to sign a contract providing for load limits, while the Union insisted that Fairmont sign the contract as agreed upon with the other employers. A charge was filed on May 11 alleging that Fairmont was obligated to sign the agreement negotiated by the Association, and a complaint issued June 11.

By letter dated May 24, Fairmont formally advised the Union that it had been forced to withdraw from the negotiating sessions on May 3, 1971, because of the load restriction issue, and that its withdrawal was in accord with its agreement with the Association not to be committed to any contract provision without prior specific approval. The Union replied by two telegrams, on May 27 and 28. The first telegram merely expressed a willingness to meet at any time. The second of these telegrams advised that the Union felt the contract with the Association was binding upon Fairmont.

### Impasse

■ When an impasse in negotiations is reached, withdrawal by a member of a multiemployer bargaining group is excused. *See* Morand Bros. Beverage Co., 91 N.L.R.B. 409, 26 L.R.R.M. 1501, 1506 (1950), *enforced*, 190 F.2d 576 (7th Cir.1951); *cf.* Ice Cream Council, Inc., 145 N.L.R.B. 865, 870, 55 L.R.R.M. 1059, 1061 (1964). This means, of course,

that it cannot be bound by a subsequent agreement between a union, having knowledge of the withdrawal, and the other employers.

■ Whether an impasse was reached is a question of fact, to which no mechanical definition can be applied. And while the Board's finding of fact is entitled to great weight, it must be supported by substantial evidence. We conclude that the record fails to support the Board's finding that no impasse was reached in this case. On the contrary, the evidence establishes that Fairmont bargained in good faith over a crucial issue, and the parties had exhausted the prospects of reaching an agreement at the time of withdrawal.

Moran's testimony that they were so far apart on April 30 that they "would be forced to have a work stoppage," and the ensuing strike, indicates that the strike may have been more than a mere bargaining stratagem. *See* Bi-Rite Foods, Inc., 147 N.L.R.B. 59, 56 L.R.R. M. 1150 (1964). The evidence is clear that both parties considered "final" offers, and upon rejection by both, the Union bargained separately with three individual employers. We find this to be persuasive evidence that an impasse was reached.

"Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations, are all relevant factors to be considered in deciding whether an impasse in bargaining existed." Taft Broadcasting Co., 163 N.L.R.B. 475, 64 L.R.R.M. 1386, 1388 (1967), enforced, 129 U.S.App.D.C. 399, 395 F.2d 622.

When viewed from the vantage of both of the parties, the record is clear that as long as Fairmont remained a member of the Association, the parties were irreconcilable on the load limit is-

sue. The only way to break the impasse was by the withdrawal of Fairmont. Other members of the group invited Fairmont to leave for this reason and Fairmont did leave for that reason. As indicated by NLRB Chairman Miller in his dissent, it seems particularly incongruous under these circumstances to find Fairmont guilty of bad-faith bargaining.

■ Because an impasse had been reached, Fairmont's withdrawal was timely. It therefore was not a violation of 8(a)(5) and (1) of the Act to refuse to be bound by an agreement reached by the Union and the multiemployer group after withdrawl with the Union's knowledge.

*Consent*

■ Not only had an impasse in negotiations been reached, but we conclude that the evidence shows the Union consented to Fairmont's withdrawal. Thus, the Union cannot be heard to complain that the withdrawal was "untimely." *See* N.L.R.B. v. Sheridan Creations, Inc., 357 F.2d 245, 247 (2d Cir.1966); C & M Construction Co., 147 N.L.R.B. 893, 56 L.R.R.M. 1270, 1271 (1964).

■ Moran made no objection to Fairmont's withdrawal when he was so informed verbally prior to reaching an agreement with the Association. Although the Union was under no affirmative duty to formally protest the withdrawal, *see* N.L.R.B. v. John J. Corbett Press, Inc., 401 F.2d 673, 675 (2d Cir. 1968), its course of conduct constituted an implied consent. *See* Publicity Engravers, Inc., 161 N.L.R.B. 221, 63 L.R. R.M. 1236 (1966). It is clear from the record that Moran knew that Fairmont was the stumbling block on the load limit issue. Yet he was willing to accept quietly the benefit to be obtained by Fairmont's withdrawal, in the form of a quick agreement to a contract, without insisting then that Fairmont sign the contract with the other employers and without even indicating to anyone at the time that he expected Fairmont to be bound.

▮ The Union's willingness to bargain with Fairmont even after the agreement was reached, as well as its willingness to bargain with the other individual employers during the impasse,[1] is further evidence of acquiescence. Atlas Sheet Metal Workers, Inc., 148 N.L.R.B. 27, 29, 56 L.R.R.M. 1442, 1443 (1964). Moran testified that "[t]he purpose of the meeting [on May 5], in our estimation, was to come to an agreement on the contract." At the meetings between the Union and Fairmont, which were attended by the mediators, many economic issues were discussed. Therefore, the Union did more than simply demand that Fairmont sign the agreement executed with the Association, all that would have been required had the Union felt Fairmont was still a member of the Association. *See* C & M Construction Co., supra, 56 L.R.R.M. at 1272.

Chairman Miller in his dissent stated the issues clearly and succinctly when he said:

"It seems clear to me that the issue of load restrictions was a stumbling block to the negotiations, and it seems equally clear to me that all parties knew that Respondent's firm position on this issue was not fully shared by other members of the group. As that situation became clear and as the parties neared their negotiating deadline, two things occurred . . . one the 'final' offer of the multiemployer negotiators failed to achieve a recommendation by the union negotiating committee and all concerned knew—as any experienced negotiators knows—that as a result the final offer was doomed to rejection and a strike was imminent. Thus at that point, an impasse existed.

"It is true that as events unfolded, the impasse was shortlived. But why? Again, it seems clear to me that a change in the position of the employers' negotiators on the issue of load restrictions was a *sine qua non* for breaking the impasse. And that became possible through Respondent's decision to go it alone on this issue and to withdraw from the group, thus clearing the way for a resolution of this issue by those who remained in the multiemployer negotiations.

"Under these circumstances, the failure of the union to protest Respondent's withdrawal is quite understandable, but as one understands it in this light, it is equally clear that its silence meant, and was indeed intended to mean, acquiescence.

"And it seems particularly incongruous for this Board to find a defecting member of a bargaining group guilty of a bad-faith bargaining when, as here, his leaving the negotiations permitted . . . and indeed was essential to . . . further progress toward meaningful bargaining between the employer group and the union."

For these reasons, we conclude that the Board's finding that there was no impasse as well as no consent on the part of the Union is not supported by the record. Consequently, Fairmont's withdrawal was excused, and it was not therefore in violation of 8(a)(5) and (1).

Enforcement denied.

---

1. We find it particularly incongruous that the Board refused to uphold the withdrawal of Fairmont from the negotiations while impliedly approving the Union's negotiation of separate contracts with three of the members of the Association during the impasse. While it is claimed that these contracts were merely interim agreements which were intended to be merged later into the Association agreement, the written agreement with Country House, Inc. was used as the basis for withdrawing the pickets from that employer's premises and contains no such reservation except as to the load limit issue. The balance of that written agreement clearly binds both the Union and Country House to specific changes in the existing agreement for a two-year period from May 1, 1971, through April 30, 1973; and if that agreement was merged into the Association agreement later negotiated, it was done by oral agreement of the parties thereto.