NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ACME WIRE WORKS, INC., Respondent.

No. 505, Docket 77–4149.

United States Court of Appeals, Second Circuit.

Argued April 10, 1978.

Decided June 30, 1978.

---

Standau E. Weinbrecht, N.L.R.B., Washington, D.C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Linda Dreeben, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Stanley Israel, New York City (Bluestone, Kliegman & Israel, New York City, of counsel), for respondent.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal was argued as a companion case to *N.L.R.B. v. Independent Association of Steel Fabricators, Inc.*, 582 F.2d 135 an opinion which is filed herewith. The Association here involved is a different association of employers, though the Local Union is the same union.

The NLRB petitions for enforcement of its order issued against Acme Iron Works, Inc. ("Acme"), a Brooklyn-based company engaged in the manufacture, sale and distribution of various metal and wire products. That order is based on Acme's refusal to execute a collective bargaining agreement between Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO ("Local 455") and Wire Works Manufacturers Association ("Association"), a multi-employer bargaining organization to which Acme belonged. The Board also determined that Acme had committed an unfair labor practice by entering into a union security contract with Local 810, Steel, Metals, Alloys and Hardware Fabricators and Warehousemen, International Brotherhood of Teamsters ("Local 810") at a time when it was obligated to bargain with Local 455. Since this petition for enforcement raises some of the same issues and arises out of the same industry-wide strike as *N.L.R.B. v. Independent Association of Steel Fabricators, Inc.*, 582 F.2d 135 (2d Cir. 1978), the two were set down for argument before the same panel.

I

For some 30 years antedating this dispute, Local 455 has represented the production and maintenance employees of the members of the Wire Works Manufacturers Association. Local 455 has represented employees of two other multi-employer associations, Allied Building Metals Industries and the Independent Association of Steel Fabricators, and has bargained separately with about 60 independent companies. Historically, the union's practice has been to negotiate a contract with Allied first or, on occasion, with the independent employers,

and then to use that agreement as the basis for contracts with the remainder of the industry.

Local 455's contracts with the steel and metal industry expired on June 30, 1975. About a month before the expiration, the Association provided the union with a list of eight employers, including Acme, who had given bargaining authorization to the Association. During June, the union met twice with Association negotiators. Before the first meeting, Local 455 circulated a general proposal asking for substantial increases in wages and contributions to the employee benefit funds. That proposal, together with general industry conditions, were the subjects of discussion at the first meeting on June 16. By letter dated June 19, the Association countered with an offer to continue the expiring contract for three years, subject to modifications concerning funds contributions. At the second June session, the union rejected that proposal. After discussing other matters such as employee training programs, vacation benefits, and the Association's right to purchase prefabricated panels, union negotiators asked if the Association had any specific wage offer to make. An Association spokesman responded that he saw no sense in making an offer until the union concluded negotiations with Allied.

On July 1, 1975, Local 455 went on strike against all employers in the industry who had not signed a new contract. In mid-July, union business representative Matienzo presented Association negotiator Bardy with a new proposed contract which specified a 10% wage increase and the same funds benefit contributions as would be negotiated with Allied. By letter of July 23, the Association rejected that proposal and asked to be apprised of any changes in the union's position.

From July 1975 through mid-January of 1976, the parties did not schedule any bargaining sessions nor did either party request bargaining. During the hiatus in bargaining, Acme entered into a collective bargaining agreement with Local 810, dated January 1, 1976.

In early January 1976, the union reached a settlement with Allied and, a week later, on January 13, presented the Association with a new stipulation based on its agreement with Allied and fifteen independent employers. The Association indicated a willingness to accept the basic economic package negotiated .with Allied, and the union acceded in general terms to the Association's demand for the right to buy prefabricated panels. Acme did not send a representative to the January 13 meeting, and when union negotiators inquired about its absence, an Association spokesman responded that he had heard that Acme was "finished" with Local 455 and agreed to have definite information by the next meeting.

The parties met again on January 19 and executed a stipulation of settlement. Again Acme was not represented, and Association negotiator Bardy informed the union that he had received a letter of resignation from Acme. The letter was dated August 11, 1975. At Colavito's request, Bardy marked the letter "Received January 16, 1976".

On January 20, the union ended its strike against all Association members except Acme, and orally informed company representative Batthaney that the union expected Acme to execute the Association agreement and reinstate union employees. By letter dated March 24, 1976, Local 455 again stated that it considered the company bound by the Association agreement, and on March 29, the union sent a letter requesting reinstatement on behalf of the company's employees. Acme made no response to either letter.

On the basis of the foregoing facts, the Board concluded that Acme had not made a timely withdrawal from multi-employer bargaining and therefore that its refusal to execute the agreement negotiated by the Association was violative of §§ 8(a)(1) and (5) of the Act.[1] The Board also found that Acme, by executing a union security contract with Local 810 at a time when it was obligated to bargain with Local 455, had violated §§ 8(a)(1), (2) and (3) of the Act and, by refusing to reinstate its workers on their unconditional offer to return to work, had violated §§ 8(a)(1) and (3) of the Act.[2]

Acme contends here, as it did before the ·Board, that its withdrawal was justified by an impasse in negotiations, by the union's bad faith in bargaining, and by dire economic circumstances. It submits further that the union made its request for reinstatement without actual knowledge of the employees' ability or inclination to return to work. We find none of these contentions persuasive.

II

 Once negotiations have commenced, a party's withdrawal from multi-employer bargaining is untimely and ineffectual absent unusual circumstances or consent by the union. *N.L.R.B. v. John J. Corbett Press, Inc.*, 401 F.2d 673, 675 (2d Cir. 1968); *N.L.R.B. v. Sheridan Creations, Inc.*, 357 F.2d 245 (2d Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). For reasons more fully canvassed in our opinion in *N.L.R.B. v. Independent Steel Fabricators Association, Inc.*, *supra*, we believe that an impasse in negotiations is an unusual circumstance justifying an employer's unilateral withdrawal from a

---

1. Section 8, 29 U.S.C. § 158, of the N.L.R.A. provides:

 "(a) It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . . .

 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

2. Section 8(a), 29 U.S.C. § 158(a), of the N.L.R.A. provides that it shall be an unfair labor practice for an employer:

 "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . .;
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

multi-employer association. Although the Administrative Law Judge concluded here that "impasse alone is not an excuse for untimely withdrawal from the multi-employer bargaining association," all of the circuits which have had occasion to address the issue have held that a bona fide impasse may be an unusual condition legitimating withdrawal. *N.L.R.B. v. Beck Engraving Co.*, 522 F.2d 475 (3d Cir. 1975); *N.L.R.B. v. Hi-Way Billboards, Inc.*, 500 F.2d 181 (5th Cir. 1974); *Fairmont Foods Co. v. N.L.R.B.*, 471 F.2d 1170 (8th Cir. 1972). *See N.L.R.B. v. Associated Shower Door Co.*, 512 F.2d 230, 232 (9th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (dictum). As our discussion of the impasse contention in *N.L.R.B. v. Corbett Press, supra*, at least inferentially suggested, we believe that a party may unilaterally withdraw from multi-employer bargaining in the face of a genuine impasse in negotiations. We do, however, agree with the Board's conclusion that the record in this case does not reflect an impasse when Acme withdrew bargaining authorization from the Association.

Respondent contends that it gave notice of its withdrawal on January 12, 1976, prior to the Association's resumption of meetings with Local 455, and again at the January 13 meeting. The sole support in the record for this assertion is testimony by Association representative Bardy that he "seem[ed] to recollect" a telephone call on January 12 or 13 in which he mentioned Acme's letter of resignation to union representative Matienzo, and that he brought the letter to the January 13 meeting. Both Matienzo and union president Colavito testified that they first learned of Acme's unequivocal intent to withdraw on January 19. The Administrative Law Judge determined to credit their "mutually corroborative" version rather than Bardy's "confusing and imprecise recollection". We see no basis for disturbing that determination, especially since Bar-

dy conceded that he had written on the letter of resignation, admitted into evidence, that it was received on January 16, 1976.[3] Thus, substantial evidence supports the finding that Local 455 did not have notice of Acme's withdrawal from multi-employer bargaining until January 19.

The Board further concluded, on the theory that withdrawal is not effective until communicated to the other party, that Acme remained part of the Association until January 19. The merits of the Board's notice requirement are readily apparent in circumstances such as those presented here. As we noted in *Independent Association of Steel Fabricators, supra*, more than idle curiosity explains a union's interest in prompt notice of withdrawals from multi-employer bargaining, at pages 148–149 of 582 F.2d.

■ Accordingly, we agree that Acme's withdrawal was not effective until communicated. *N.L.R.B. v. Dover Tavern Owners' Ass'n*, 412 F.2d 725, 728 n. 7 (3d Cir. 1969); *Goodsell & Vocke, Inc.*, 223 N.L.R.B. 60, 66 (1976), *enforced*, 559 F.2d 1141 (9th Cir. 1977); *Pomona Building Materials Co.*, 174 N.L.R.B. 558, 560 (1969), *enforced*, 73 L.L.R.M. 2944 (9th Cir. 1970). Whatever the state of negotiations in August when the letter was dated, or on January 12 or 13 when Bardy claimed to have received it, there was no impasse when the parties met on January 19. By then, prospects for a settlement were excellent; in fact, an agreement was reached that day.

■ In any event, even if Acme had communicated its withdrawal at an earlier date, its claim of impasse would be unavailing. The suspension of negotiations does not of itself indicate that further discussion would have been fruitless. Here, according to union representative Matienzo, on two occasions during the summer of 1975, the Association made clear its desire to defer bargaining until the Allied negotiations were

---

**3.** Nor do we find any basis for overturning the Administrative Law Judge's refusal to credit Bardy's testimony that he had been mistaken about the date when he marked the letter "Received on January 16." As this court has re-

peatedly noted, we will generally not upset credibility determinations by the trier of the facts. *N.L.R.B. v. Dinion Coil Co.*, 201 F.2d 484, 490 (2d Cir. 1952). *See N.L.R.B. v. Columbia University*, 541 F.2d 922, 928 (2d Cir. 1976).

concluded. Given the industry's practice of using the Allied contract as a benchmark, and Association representative Bardy's intermittent attendance at Allied bargaining sessions, it is not, as respondent submits, "inherently incredible" (respondent's brief at 22) to suppose that the Association was willing to suspend negotiations in this case. Unlike *Independent Association of Steel Fabricators, supra,* where both parties displayed intransigence on a critical issue, that of eliminating contract disparities between Allied and Independent Association members, there is nothing in the record here to suggest that the Union would decline to give Wire Works employers the benefit of the Allied agreement, and nothing to indicate that they had reason to hope for something better.

■ We also find unpersuasive Acme's assertion that its withdrawal was justified by Local 455's bad faith bargaining. Respondent submits that the union's desultory pre-strike negotiating approach, its failure to meet with the Association for over six months, and its failure to specify details concerning funds contributions and substantive aspects of a second and third year settlement until after the Allied negotiations ended, taken together, are indicative of surface bargaining. Assuming *arguendo,* as did the Board, that surface bargaining could excuse an otherwise untimely withdrawal, respondent's claim here is not well-founded. Given the Association's previous reliance on the Allied contract as a benchmark, the failure of both parties to present a complete and definitive economic package in June is scarcely evidence of bad faith. That conclusion is fortified by the failure of Acme or the Association to file charges with the Board complaining of Local 455's alleged surface bargaining.

■ We also reject Acme's claim that dire economic circumstances justified its withdrawal. Respondent submits that the possibility of a protracted strike, coupled with the deeply depressed state of the industry, jeopardized its existence as a "viable business entity." *Hi-Way Billboards, Inc.,* 206 N.L.R.B. 22, 23 (1973), *enforce-*

*ment denied on other grounds,* 500 F.2d 181 (5th Cir. 1974). Yet, as the Administrative Law Judge pointed out, Acme "submitted no evidence of its own impending economic doom nor any economic evidence whatsoever." That other employers, part of the same distressed industry, and subject to the same protracted strike, retained their membership in the Association is some evidence that Acme's economic existence was not imperilled. Although respondent complains that the record does not indicate whether other members of the unit were able to remain in business after the strike (respondent's brief at 27), it had the burden of adducing such evidence if it wished to defend its withdrawal on the basis of economic necessity.

■ We thus find substantial evidence on the record as a whole to justify the Board's conclusion that respondent had not made timely withdrawal from group bargaining and that it was therefore obligated to execute the contract negotiated by the Association. *See N.L.R.B. v. Corbett Press, supra,* 401 F.2d at 675; *N.L.R.B. v. Sheridan Creations, supra,* 357 F.2d 247–48.

### III

■ When an employer's unfair labor practices prolong or aggravate a strike begun in support of economic objectives, its employees, as unfair labor strikers, are entitled to reinstatement upon their unconditional offer to return to work. *See Mastro Plastics Corp. v. N.L.R.B.,* 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); *N.L.R.B. v. Windham Community Memorial Hospital,* 577 F.2d 805, 814 (2d Cir. 1978); *N.L.R.B. v. Johnson Sheet Metal, Inc.,* 442 F.2d 1056, 1061 (10th Cir. 1971); *N.L.R.B. v. Fitzgerald Mills Corp.,* 313 F.2d 260, 269 (2d Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). Having found that respondent's refusal to execute the collective bargaining agreement negotiated by the Association converted the strike against Acme into an unfair labor practice strike,

the Board concluded that Acme employees were entitled to reinstatement as of March 29, 1976, the date on which the union sent a letter making an unconditional offer to return to work in their behalf.

■ Respondent contends here, as it did before the Board, that the union's offer was ineffectual because it was a pro forma request made without actual knowledge of the circumstances of the four employees involved. In fact, respondent points out, two employees had already returned to work before the union's offer, a third was ill when the letter was sent, and the availability of the fourth was unclear at the time of the hearing. However, Matienzo's testimony that he had personally spoken to three of the four employees concerning reinstatement around the time the union sent its letter is sufficient to support the Board's finding that Local 455's offer in behalf of the workers was legitimate.[4] Further questions as to the actual availability of the two employees who did not return to work may be resolved in the compliance phase of these proceedings where the Board can fashion its reinstatement and back pay order to reflect all such mitigating factors. *See N.L.R.B. v. C.C.C. Associates, Inc.*, 306 F.2d 534, 539–40 (2d Cir. 1962); *N.L.R.B. v. Duncan Foundry and Machine Works, Inc.*, 435 F.2d 612, 616 (7th Cir. 1970).

Enforcement granted.

---

4. Although Matienzo also testified that he had heard that the fourth employee had returned to work, the Administrative Law Judge concluded that this testimony afforded an inadequate basis for a finding, particularly since Matienzo indicated no knowledge of the date and circumstances of the return.