630 F.2d 595
 105 L.R.R.M. (BNA) 2510, 89 Lab.Cas. P 12,250
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Joseph J. CALLIER et al., d/b/a Callier's Custom Kitchens, a
co-partnership, Respondent,
Carpenters' District Council of Greater St. Louis, AFL-CIO,
Intervenor-Petitioner.
 No. 79-1899.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 9, 1980.
Decided Sept. 8, 1980.
 
 Lafe E. Solomon, Attorney, N. L. R. B., Washington, D. C., argued, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, on brief, for petitioner.
 Morris J. Levin, Levin & Weinhaus, St. Louis, Mo., argued, Gerald Kretmar, St. Louis Mo., on brief, for intervenor-petitioner, Carpenters' District Council, etc.
 Edwin P. Harrison, Clayton, Mo., for respondent.
 Before ROSS, Circuit Judge, GIBSON, Senior Circuit Judge, and HANSON, District Judge.*
 ROSS, Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions for enforcement of its Decision and Order of August 6, 1979, 243 N.L.R.B. 143, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e). In that proceeding, the respondent, Joseph J. Callier (Callier's Custom Kitchens) was found to have violated Sections 8(a)(5) and (1) of the Act[1] by refusing to honor a collective bargaining agreement negotiated by the Associated Cabinet Shops and Laminating Industry of St. Louis (the Association), a multiemployer bargaining association, and the Carpenters' District Council of Greater St. Louis, AFL-CIO (the union). The Board found that Callier was bound by the terms of the agreement by virtue of the company's membership in the Association.
 
 
 2
 Callier's argument before the Board and again in this proceeding is that the company withdrew from the Association prior to the signing of the final agreement, but after the negotiations had begun. While withdrawals after negotiations have begun are invalid absent unusual circumstances or union consent, NLRB v. Acme Wire Works, Inc., 582 F.2d 153, 156 (2d Cir. 1978), Callier argues that its withdrawal in this case was justified by the union's negotiation of interim agreements with individual members of the Association after negotiations on the final agreement had commenced. The interim agreements, it is claimed, fragmented the Association's bargaining strength, and provided sufficient grounds for according Callier the right to withdraw from the multi-employer bargaining unit.
 
 
 3
 In rejecting Callier's contentions, the Board relied on the limited view of the right of withdrawal, which was adopted by the Board in Retail Associates, Inc., 120 N.L.R.B. 388, 395, 41 L.R.R.M. 1502 (1958). The Board's position, stated briefly, is as follows: Once negotiations between the union and the association have begun, an employer's withdrawal from the association is untimely and ineffective unless unusual circumstances or union consent justify that withdrawal. The unusual circumstances exception has been limited by the Board to include only two types of cases, however: those in which the employer is suffering extreme financial hardship, and those in which the association has become so fragmented that it ceases to be a viable bargaining entity. Since, in the Board's opinion, Callier failed to establish that its withdrawal fell within one of the two categories of unusual circumstances, and since there was no evidence that the union consented, the Board found Callier's withdrawal to be untimely and invalid.
 
 I.
 
 4
 The facts in this case are not in dispute. The respondent joined the Association in 1969, and was a party to the contract between the Association and the Carpenter's union which expired on April 30, 1978. Prior to the expiration, however, in its letter of February 23, 1978, the union notified the Association and each of its members (including Callier) that it wished to begin negotiations on a new contract. On March 10, Callier authorized the Association, in writing, to bargain with the union on its behalf. The bargaining commenced in earnest on March 28, and continued without impasse until the final agreement was signed on August 8.
 
 
 5
 Callier's refusal to sign the final agreement stems from the company's disapproval of the union's negotiation of interim agreements with individual members of the Association. On May 1, long after negotiations on the final agreement had commenced, the union's business agent requested that Callier sign an "Interim Labor-Management Working Agreement." The interim agreement contained terms and conditions which the Association specifically had rejected in the negotiations, and Callier refused to sign it. A strike involving all of Callier's employees immediately followed. The union presented interim agreements to all of the companies which were members of the Association except for those five employers whose employees served on the group's bargaining committee. In the end, over forty of the sixty-five members of the Association signed the interim agreements.
 
 
 6
 On May 4, Callier notified the Association that his company was withdrawing from the organization. The company gave no notice of the withdrawal to the union. Furthermore, there is no evidence in the record to suggest that the Association notified the union of the attempted withdrawal. On that same day, one of Callier's employees filed a decertification petition with Region 14 of the Board, and the employees returned to work. On May 25, the Regional Director dismissed the petition, noting that Callier's withdrawal from the Association was untimely, and that the unit seeking decertification was therefore not coextensive with the bargaining unit to which it still belonged-the Association. The Regional Director's letter of dismissal was the union's first notice of Callier's attempted withdrawal.
 
 
 7
 Following the adoption of the new contract, the union sent a written request to Callier for information necessary to enforce the provisions of the new contract. On September 6, Callier responded that it had withdrawn from the Association and that it would not abide by the terms of the new agreement. The union's charges against Callier were filed two days later.II.
 
 
 8
 We note at the outset that we disagree with the Board's limited view of the circumstances under which an employer may withdraw from a multiemployer bargaining unit once negotiations have begun. Callier argues persuasively in this case for an expanded view of the unusual circumstances exception, and in our opinion, there is strong logic and authority for the proposition that in a situation such as this, a union's negotiation of interim agreements with individual members of a multiemployer bargaining association, coupled with strikes, can fragment the bargaining association to the extent that it provides sufficient grounds for according an employer the right of withdrawal. See NLRB v. Beck Engraving Co., 522 F.2d 475, 483 (3d Cir. 1975); Fairmont Foods Co. v. NLRB, 471 F.2d 1170, 1174 n. 1 (8th Cir. 1972). When viewing all of the facts in this case, however, we conclude that we need not reach the issue of whether the interim agreements justified Callier's withdrawal. Callier's withdrawal was ineffective under any theory of the unusual circumstances exception because the company failed to provide the union with unequivocal notice of its withdrawal. See NLRB v. Independent Association of Steel Fabricators, Inc., 582 F.2d 135, 149 (2d Cir. 1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). Furthermore, the evidence in the record does not support a conclusion that the union acquiesced in or impliedly consented to the company's untimely and ineffective withdrawal. Therefore, Callier is not excused from complying with the final agreement. Accordingly, with the limitations set forth below, we enforce the Board's Decision and Order of August 6, 1978.
 
 
 9
 It is the general rule among those circuits which have had occasion to consider the issue that an employer's withdrawal from a multiemployer bargaining association is invalid unless unequivocal notice of the withdrawal has been given to the union.[2] This rule applies even when the withdrawal is justified under the unusual circumstances exception:
 
 
 10
 For an employer to withdraw bargaining authorization from a multi-employer association without notifying the union is not simply a breach of etiquette. Such tacit withdrawal not only withholds knowledge from the union about the composition of the bargaining unit, but also deprives it of the opportunity either to initiate independent negotiations with the withdrawing party or to file a complaint promptly with the Board. To abrogate the notice requirement when one party leaves multi-employer bargaining in the face of an impasse would interject a further element of uncertainty into a negotiating context already destabilized by withdrawal.
 
 
 11
 NLRB v. Independent Association of Steel Fabricators, supra, 582 F.2d at 149. In the present case, Callier did not notify the union of its withdrawal, and there is no evidence in the record which might suggest that the Association fulfilled this requirement for the company. We therefore hold that Callier's withdrawal was ineffective and untimely due to the company's failure to give notice to the union.
 
 
 12
 This conclusion does not end our inquiry, however. There is strong authority for the position that a union's acquiescence in our implied consent to an employer's untimely withdrawal will excuse that employer's subsequent refusal to honor a bargaining agreement negotiated by the union and the association. Fairmont Foods Co. v. NLRB, supra, 471 F.2d at 1173-74; Union de Tronquistas de Puerto Rico v. Arlook, 586 F.2d 872, 877 (1st Cir. 1978) (no clear error where the Board applied the acquiescence doctrine in the context of a Section 8(b)(4) (A) charge). In the present case, where the union received the Regional Director's letter more than 10 weeks prior to the signing of the final agreement, we must consider whether the record might indicate that the union acquiesced in or impliedly consented to the withdrawal during that period of time.
 
 
 13
 In its Decision and Order of August 6, 1978, the Board concluded that there was no evidence to suggest that the union consented to Callier's withdrawal. We have reviewed the entire record in this proceeding, and we believe that it supports the Board's conclusion. While it is true that the union had constructive notice of Callier's attempted withdrawal long before the signing of the final agreement, there simply is no other evidence in the record which could be construed to support a claim of acquiescence or implied consent.[3] There is no evidence, for example, that the union attempted to benefit from Callier's withdrawal in its negotiations with the Association or that the union attempted to deal with Callier on an individual basis after receipt of notice of Callier's unsuccessful attempted withdrawal. See Fairmont Foods Co. v. NLRB, supra, 471 F.2d at 1173-74.
 
 
 14
 In addition, even aside from the fact that a union is under no duty to formally protest an employer's withdrawal, NLRB v. John J. Corbett Press, Inc., 401 F.2d 673, 675 (2d Cir. 1968), we feel that the facts in this case justify the union's failure to protest. The union's notice of the withdrawal came in the Regional Director's letter of May 25, which indicated in no uncertain terms that "the Employer did not withdraw in a timely manner from the multi-employer collective bargaining * * *." This conclusion was affirmed by the National Labor Relations Board on June 29, 1978. In light of the union's knowledge of this Board decision, and the failure of Callier to take any further steps to notify the union, the union's failure to protest the withdrawal can hardly be deemed acquiescence or implied consent. We therefore have little difficulty in upholding the Board's conclusion that the union did not consent to Callier's withdrawal.
 
 
 15
 Since Callier failed to give unequivocal notice of its withdrawal to the union, and since the union did not consent or acquiesce to that withdrawal, we hold that Callier's refusal to honor the final agreement between the union and the Association violated Sections 8(a)(5) and (1) of the Act. In reaching our conclusion, we expressly withhold judgment on the issue of whether, under the circumstances of this case, and if timely notice had been given, the union's negotiation of interim agreements with members of the Association justified Callier's withdrawal.
 
 
 16
 We have examined Callier's other contentions and find them to be without merit. Accordingly, with the limitations hereinbefore stated, we enforce the Board's Decision and Order of August 6, 1979.
 
 
 
 *
 The Honorable WILLIAM C. HANSON, Senior United States District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 29 U.S.C. §§ 158(a)(1) and (5) read as follows:
 (a) It shall be an unfair labor practice for an employer-
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [2]
 See NLRB v. Acme Wire Works, Inc., 582 F.2d 153, 157 (2d Cir. 1978); NLRB v. Associated Shower Door Co., 512 F.2d 230, 232 (9th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); NLRB v. Central Plumbing Co., 492 F.2d 1252, 1255 (6th Cir. 1974); NLRB v. Dover Tavern Owners' Ass'n, 412 F.2d 725, 728 (3d Cir. 1969)
 
 
 [3]
 Although Callier's Answer to the Complaint alleges that "on two occasions the charging party herein attempted to negotiate with them as an 'independent shop', thereby assenting to their withdrawal from the Association," no evidence was introduced by Callier in support of this claim. In fact, Callier called no witnesses and introduced no evidence other than the joint stipulation of facts and one exhibit. We therefore have no evidence which would permit the conclusion that the union "assented" to Callier's withdrawal