**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TULSA SHEET METAL WORKS, INC., Respondent.**

No. 8244.

United States Court of Appeals
Tenth Circuit.

Oct. 5, 1966.

Nancy M. Sherman, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Margaret M. Farmer, Atty., N. L. R. B., with her on the brief), for petitioner.

Carl D. Hall, Jr., of Hall & Sublett, Tulsa, Okl., for respondent.

Before MURRAH, Chief Judge, and PICKETT and HICKEY, Circuit Judges.

PICKETT, Circuit Judge.

This case is before the court upon petition of the NLRB for enforcement of its order requiring Respondent, Tulsa Sheet Metal Works, Inc. to discontinue certain unfair labor practices found to violate Section 8(a) (5) and (1) of the National Labor Relations Act.

In 1951 Respondent, a manufacturer of sheet metal products, joined Tulsa Sheet Metal Contractors Association, which represented its members in negotiating collective bargaining agreements with the Sheet Metal Workers International Association, Local Union No. 270. The most recent collective bargaining agreement, executed in 1961, was to expire on May 31, 1963. When the Union and the Association indicated their respective desire to enter into negotiations for a new agreement, Respondent, along with several other firms, executed a composite "Letter of Assent", designating the Association as its representative for the purpose of negotiating a collective bargaining agreement. Thereafter, by letter to the Union, the Association

listed 27 firms, including Respondent, which had executed letters of assent. Negotiations failed to achieve a new agreement by May 31, 1963, and on June 1, the existing contract having expired, the Union called a strike against all members of the Association. Nevertheless, negotiations continued—meetings were held on June 4, 5, 6 and 12—and finally, on June 21, 1963, a new collective bargaining agreement, retroactive to June 1, was executed by the Association and the Union.

In the meantime, while the strike was in progress, Respondent, on June 3, submitted its resignation from the Association. On the following day the Association accepted the resignation and informed the Union that it no longer was bargaining on Respondent's behalf. Respondent did not notify the Union directly of its withdrawal, but it did not thereafter participate in the negotiations between the Union and the Association. On June 11 the Union advised Respondent by letter that it could not accept its "withdrawal at this late date * * *" Thereafter, on July 9, a meeting was held between the Union and Respondent, at which time Respondent attempted to negotiate a wage scale lower than that provided for in the June 21 agreement. The Union took the position that the withdrawal from the Association was untimely and ineffective, that Respondent was bound by the contract of June 21, and that further negotiations would be improper.

When Respondent refused to execute or be bound by the agreement of June 21, 1963, the Union filed with the NLRB an unfair labor practice charge. A complaint issued, and a hearing was held. The Board adopted the trial examiner's decision in full and concluded that Respondent's withdrawal was untimely and

that it was guilty of violations of Section 8(a) (5) and (1) of the National Labor Relations Act by refusing to bargain collectively with the Union through the Association, by refusing to execute the collective bargaining agreement negotiated by the Association and the Union on June 21, 1963, and by engaging in individual bargaining with one of its employees. The Board's order required Respondent to cease and desist from the unfair labor practices, to execute and give retroactive effect to the collective bargaining agreement of June 21, 1963, (excepting certain provisions relating to subcontracting and union security), and to reinstate, without prejudice, all employees who were on strike.

■ The order of the Board is based essentially upon the untimeliness and consequent ineffectiveness of Respondent's withdrawal from the Association.[1] In National Labor Relations Board v. Truck Drivers Local Union, No. 449 etc., 353 U.S. 87, 95–96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676, the Supreme Court recognized multi-employer bargaining to be a "vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining", and observed that "Congress intended ' * * * to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.' * * * " Although participation in multi-employer bargaining is voluntary, the Board has repeatedly held that withdrawal therefrom can be accomplished only at an appropriate time and that in the absence of union consent or unusual circumstance, withdrawal is untimely if attempted after the commencement of negotiations. See, NLRB v. Sheridan Creations, Inc., 2 Cir., 357 F.2d 245, and NLRB v. Sklar, 6 Cir., 316 F.2d 145.

---

[1]. The trial examiner stated: " * * * the issue here posed is whether an employer which engages in group bargaining looking toward the consummation of a collective-bargaining agreement binding upon it individually and as a member of the bargaining group may, in mid-negotiations, and in the absence of a bargaining impasse and before agreement has been reached, but after the previous association-wide agreement has expired and an economic strike against all Association members has commenced, effect a timely withdrawal from group bargaining."

Here Respondent had not only participated in the Association's collective bargaining agreements for several years, but also, when negotiations for a new contract became imminent, firmly designated the Association as its exclusive representative in contract negotiations with the Union. Furthermore, prior to withdrawal, Respondent's president actively participated in a number of bargaining sessions with the Union.[2] In these circumstances, Respondent's withdrawal on June 3, 1963, long after negotiations had commenced, can hardly be characterized as timely.

■ Respondent asserts that its withdrawal was rendered permissible due to existing special circumstances. It is contended that the withdrawal was justified by the existence of an impasse in bargaining. This contention, however, finds no support in the record, for while substantial disagreement existed on May 31, the parties nevertheless contemplated and arranged for additional bargaining sessions after the expiration of the existing contract, and these meetings ultimately produced an agreement. Furthermore, the Union, between May 31 and June 17, executed "interim agreements" with ten Association members, whereby these members agreed "to accept without exception or reservation, all terms and conditions of employment without limitations, as may be agreed upon in negotiations now being conducted by and between [the union] and [the association]." This indicates an expectation that negotiations would continue to a successful conclusion, and it is apparent that there was no impasse.

■ Respondent urges that the Board should have given effect to its withdrawal from the Association because the wage scale then being seriously considered was excessively high with respect to Respondent's employees and would be financially ruinous. However,

to allow withdrawal from the multi-employer bargaining unit because negotiations are apprehended by one of the group members to be progressing toward an agreement which would be economically burdensome insofar as it is concerned, would be disruptive to the stability of the group collective bargaining process. As the trial examiner observed, " * * * some responsibility must rest upon the employer who invokes the advantages of group bargaining to assess and assume the responsibilities and limitations inherent therein." Furthermore, the record indicates that while the Union offered to consider a lower wage scale if the Respondent could that it actually was engaged in "production" rather than "construction" operations, Respondent apparently elected to pursue the matter no further. Under these circumstances, Respondent's dissatisfaction with proposed wage scales is not justification for withdrawal from the bargaining unit.

■ The June 21 contract contains two clauses relating to union security and subcontracting, both of which are admittedly illegal. The Board's order requires the Respondent to execute and give retroactive effect of the contract, excepting these two illegal provisions. It is argued that these illegal provisions invalidated the contract and justified Respondent's withdrawal from the Association, refusal to bargain, and refusal to execute the contract. However, Union insistence upon the inclusion of these clauses in the collective bargaining agreement was not the cause of Respondent's withdrawal, and the contention appears to be an afterthought. Respondent's withdrawal from the bargaining unit was based not upon the issue of these clauses, but rather primarily upon the issue of wages. Indeed, the conclusion is inescapable that when the extent of the Union's wage demands became known, Respondent resisted and then withdrew from the bargaining

2. Roland Chaney was associated with Respondent from 1949 to 1963 as a partner and as president after incorporation. He was a member of the bargaining committee of the Association from April, 1954 to June 4, 1963, the date when Respondent served notice of withdrawal.

group rather than accede to the Union's wage demands.[3]

■ Respondent asserts that had it signed the contract containing the subcontracting and union security clauses, it would have been guilty of an unfair labor practice, citing NLRB v. Broderick Wood Prod. Co., 10 Cir., 261 F.2d 548, and Stackhouse Oldsmobile, Inc. v. NLRB, 6 Cir., 330 F.2d 559. The agreement which was eventually executed, however, contained a "savings and severability" provision.[4] We are, of course, mindful that not all provisions of a collective bargaining agreement are severable. But employment contracts should not be completely obliterated because some provisions are beyond the legal limits of the parties' bargaining power, unless such illegal provisions permeate the complete contract to such an extent as to affect its enforceability entirely. National Labor Relations Board v. Rockaway News Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832. Here the questioned clauses are not basic to the whole scheme of the contract, and there is no provision that

the contract is "integrated" or that its respective sections are "interdependent." This is not a case like NLRB v. Broderick Wood Prod. Co., supra, where the illegal union security clause was the very basis for the unfair labor practice charge; here neither of the illegal clauses had anything to do with the charge. This court thus distinguished the case from Rockaway News Co.,[5] supra, which we think applicable herein. See, 31 Am. Jur. Labor § 99; Anno. 14, A.L.R.2d 846.

■ As to the Board's finding that Respondent attempted to bargain individually with one of its employees at a time when it was obligated to bargain through the Association, suffice it to say that the evidence is clear that Respondent's president, Chaney, undertook on June 13, 1963 to discuss with employee Collins, a union member, the terms by which he would agree to return to work in a non-union capacity. Such conduct violates the Act. May Stores Co. v. Labor Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145, reh. denied 326 U.S. 811, 66 S.Ct. 468, 90 L.Ed. 495; Medo Corp. v. Labor Board, 321 U.S. 678, 64 S.Ct. 830,

3. The Board, in its order, stated: "We agree with the Trial Examiner that the Respondent's contention has no merit because the Respondent's refusal to sign the Association contract was not in fact based on the Union's insistence that these clauses be included in the contract, but was motivated solely by its unwillingness to accept the Union's demand for increased wages. We adopt the Trial Examiner's Recommendations, which conditions the execution by the Respondent of the Association's agreement on the deletion of the illegal provisions."

4. "Savings Clause. Section 12-1. The signatory parties are executing this agreement with the belief that it is in conformity with all State and Federal Laws and Governmental Rules and Regulations; however, if any of the provisions contained herein are in conflict with any of the above laws, rules and regulations, and same has been invalidated by a court or agency which has proper jurisdiction over same, then the signatory parties agree to make such modification or amendments to conform with the above laws, rules and regulations.

Section 12-2. In the event that any provisions of this agreement shall be held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining provisions of this agreement; and the provisions held illegal or invalid shall be fully severable and the agreement shall be construed and enforced as if said illegal or invalid provisions had never been inserted herein."

5. In NLRB v. Broderick Wood Prod. Co., 10 Cir., 261 F.2d 548, 556, it was said: "Here, the union-security clause was the very basis for the charge of unfair labor practices. It was the union-security clause that Teamsters were enforcing when demanding that the employees be discharged. Moreover, in Rockaway News, the clause considered severable was a complete and separate portion of the contract. Here, the preferential hiring provision which respondents insist must be severed from the contract is a sentence contained within the union-security clause itself. To lift out one portion of the union-security clause while at the same time giving effect to the remainder of the paragraph would be but to corrupt the purport of Rockaway News."

88 L.Ed. 1007. See, also, NLRB v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 245 F.2d 594.

As to Respondent's remaining contentions, we have carefully examined the record and are satisfied that in all respects the evidence supports the Board's findings and conclusions.

The order will be enforced.