AUTHORIZED AIR CONDITIONING CO., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 78–2427.

United States Court of Appeals, Ninth Circuit.

Oct. 19, 1979.

John W. Prager, Jr., Musick, Peeler & Garrett, Los Angeles, Cal., for petitioner.

Andrew F. Tranovich, Lawrence E. Blatnik, N.L.R.B., Washington, D. C., for respondent.

Before BARNES, BROWNING and ELY, Circuit Judges.

ELY, Circuit Judge:

Pursuant to Section 10(f) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(f), Authorized Air Conditioning, Inc. ("the Company") petitions for review of a final order of the National Labor Relations Board ("the Board"). The Board found that the Company had violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5), by the Company's refusal to execute and abide by a collective-bargaining agreement negotiated by a multi-employer bargaining association ("the Multi-Employer Association")[1] of which the Company was once a member. The Board's Decision and Order is reported at 236 N.L.R.B. No. 24 (1978). The Board cross-petitions for enforcement of its Order.

The Company is a heating, cooling, and air-conditioning contractor in the building and construction industry, and it operates primarily in the Southern California area. At all relevant times herein, Paul Osborne was its president and general manager. In July of 1974, Osborne approached Paul Healy, the business manager of Local 509,[2] to discuss the possibility of employing Local 509 members. On September 9, 1974, Osborne signed on the Company's behalf a collective-bargaining agreement that consisted of two documents. The first was the Standard Form of Union Agreement ("Standard Form"), a contract negotiated by the Sheet Metal Workers International Association and the Sheet Metal and Air-Conditioning Contractor's National Association ("the National Association")—the latter being the parent organization of the Multi-Employer Association. The second document was an Addendum to the Standard Form ("Addendum") which was negotiated by Local 509 and the Multi-Employer Association. Both documents, by their terms, were to be effective until July 31, 1976.

At the time the Company signed the collective-bargaining agreement, Osborne also signed a Notice of New Shop Contract which listed five persons as the employees of the Company as of September 9, 1974. At that time, none of the Company's employees were members of Local 509 or had otherwise authorized the Union to represent them. The collective-bargaining agreement was therefore a pre-hire agreement as provided in Section 8(f) of the Act, 29 U.S.C. § 158(f).[3]

Article V, Section 1 of the Standard Form contains a closed shop provision whereby the employer agrees to require membership in the Union within eight days of an employee's first day of work as a

---

1. Inland Air-Conditioning and Refrigeration Contractors Association, Inc.

2. Local 509, Sheet Metal Workers International Association, AFL–CIO (hereinafter "Local 509" or "the Union").

3. It is not an unfair labor practice for an employer engaged primarily in the building and construction industry to enter into a collective-bargaining agreement with a union that has not attained majority status prior to the execution of the agreement. 29 U.S.C. § 158(f); *NLRB v. Iron Workers,* 434 U.S. 335, 337–38, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

condition of continued employment.[4] When he signed the Standard Form, however, Osborne was told by Healy that the Company's employees would have thirty days to sign membership applications with Local 509. On October 9, 1974, four of the five employees listed on the Notice of New Shop Contract had filled out Union membership applications. The fifth employee was an apprentice.[5]

On September 29, 1975, while the collective-bargaining agreement was still in effect, the Company submitted applications for membership in the Multi-Employer Association and its parent organization, the National Association. Both are trade associations engaged in legislative, public relations, architectural, and labor relations activities in the sheet metal and air-conditioning industry. The Multi-Employer Association is also the exclusive collective-bargaining representative for its members in a specified area of Southern California. The Multi-Employer Association's Application for Membership Form ("Application") is a one-page document with the same type-face throughout. It contains only three paragraphs of text, the latter two of which state as follows:

The undersigned hereby applies for membership in the INLAND AIR CONDITIONING AND REFRIGERATION CONTRACTORS ASSOCIATION INC.,

and in connection therewith hereby states and agrees:

\* \* \* \* \* \*

2. That if admitted to membership the undersigned will abide and be bound by all the provisions of the Articles of Incorporation and By-laws of the Corporation as they now exist and as they may be amended, and will thereby, and also by virtue of this application, become a party to and be bound by the existing labor agreements between Sheet Metal Workers International Association Local Union 509 AFL–CIO and/or United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, Local Unions 364 and 398 AFL–CIO and the Inland Air Conditioning and Refrigeration Contractors Association Inc. Receipt of copies of the Articles, By-laws and labor agreements now in force is hereby acknowledged.

3. The INLAND AIR CONDITIONING AND REFRIGERATION CONTRACTORS ASSOCIATION, INC., is hereby designated as the sole and exclusive collective bargaining representative for and on behalf of the undersigned, and the Corporation and its Officers and other designated representatives are authorized to execute any and all labor agreements and documents which are to be binding upon the members of the Corporation in accordance with the By-laws.[6]

---

4. Article V, Section 1 of the Standard Form provides:

ARTICLE V

SECTION 1. The Employer agrees to require membership in the Union, as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable ground for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

5. Although the Company disputes the Board's finding with respect to both the number of employees at the Company on October 9, 1974, and the number of those employees who became Local 509 members, we find the Board's finding to be clearly supported by substantial evidence and thus reject the Company's contentions in this regard.

6. The By-laws of the Multi-Employer Association ("By-laws") contain a provision that restates the requirements of Paragraph 3 of the Application. Article X of the By-laws provides in pertinent part:

ARTICLE X

*Section 1: Collective Bargaining*: Each regular member herewith appoints the Corporation and its Board of Directors or its nominee as exclusive collective bargaining agent in dealing with any labor organization affecting the air conditioning, refrigeration or sheet metal industry. Each regular member grants

Paragraph 2 of the Application requires the Company to be bound by one of two existing labor agreements between the Multi-Employer Association and the unions that had established bargaining relations with it. One of these agreements was the same as the Company's collective-bargaining agreement with Local 509, and thus the Company satisfied the requirement of Paragraph 2.

By letter dated December 18, 1975, the Company was notified that it had been accepted as a member of the Multi-Employer Association and its parent, the National Association. The letter indicated that the by-laws of both organizations were enclosed. At the time the Company's Application was accepted, a majority of the Company's employees were not members of Local 509, and the closed shop provision in the Standard Form was not being enforced.

On February 26, 1976, Local 509 gave the Multi-Employer Association timely notice of its intent to reopen its agreement with the multi-employer bargaining unit. Negotiations commenced on May 20, 1976. In late June of that year, the Multi-Employer Association provided Local 509 with a list of its members. The Company was included in that list. By August 4, 1976, the only remaining unresolved issue in the negotiations was wages. On August 9, 1976, the parties, being unable to reach a concensus, submitted the wage issue to a third party, the National Joint Adjustment Board ("NJAB"), as provided in the respective labor agreements. On August 11th, the NJAB issued a unanimous decision setting forth the wage increase to be included in the new contract and provided that the contract would be effective from August 1, 1976 through July 31, 1978. The Multi-Employer Association and Local 509 entered into the new collective-bargaining agreement, and Local 509 began to contact the individual members of the Multi-Employer Association in order to secure their signatures on the new contract.

In a letter dated July 14, 1976, the Company notified the Multi-Employer Association of its intent to withdraw from membership in the unit effective June 1, 1976.[7] Article VI, Section 4(a) of the By-laws provides that a member may not resign or withdraw within four months prior to or

complete and exclusive authority to the Corporation aforesaid to do any of the following:

A. Negotiate, conclude and execute contracts which bind the Corporation and its members, jointly and severally.

B. Administer collective bargaining and trust agreements and make settlements, decisions and agreements interpreting and applying any agreement which action shall be binding upon the Corporation and its members.

C. Obtain rulings before any court or agency concerning any tax or other aspect of any contract, agreement or trust fund to which the Corporation or any member is a party, and to comply with the filing or reporting requirements of any State or Federal Law with reference thereto.

*Section 2*: Members hereby are expressly bound to take joint and united action in support of each other and the Corporation in dealing with any labor organization and each member:

A. Shall deem any economic action by any labor organization against any member as a like action against all members and against the Corporation, when so declared by the Board of Directors.

B. Shall suspend or operate business or employ or not employ employees represented by

any Union at such times and places as directed by the Board of Directors.

C. Shall not operate a job while other members are shut down, when so declared by the Board of Directors.

D. Shall not sign any Union agreement individually with any Union with which the Corporation bargains in behalf of its members.

E. Shall not individually or through any agent, negotiate or deal separately with any Union with which the Corporation bargains in behalf of its members.

F. Shall not entice any employees from any other member in any manner. Payment over wage bargaining agreements signed by the Corporation shall constitute enticement.

G. Shall refer to the Corporation all disputes or problems and interpretations arising between any employee, and Union and the member in relation to any Union.

H. Shall be bound by all decisions and interpretation issued by the Corporation affecting the labor relations between a member and employee.

7. The Company apparently had verbally contacted the Multi-Employer Association on a number of prior occasions beginning in February, 1976 as to its desire to withdraw from the trade association.

after the termination date of any collective-bargaining agreement of which the Multi-Employer Association is a party and which covers the members' employees. It also provided that a member's resignation became effective only upon acceptance by the Board of Directors of the Multi-Employer Association. Because the Board of Directors found the Company's request for withdrawal to be untimely under the By-laws, it took no action with respect to the Company's letter.

In late August, 1976, the business manager for Local 509 contacted Osborne and asked that the Company sign the new bargaining agreement negotiated by the Multi-Employer Association. Osborne refused on the grounds that the Company was no longer a member of the multi-employer bargaining unit and because the "wages are too high" in the new contract. Thereafter, the Company failed to make any of the required payments to the health and pension funds of its employees as were provided for in the new bargaining agreement.

The Board, in agreement with the Administrative Law Judge, found that the Company had violated Sections 8(a)(1) and (5) of the Act by refusing to sign the new collective-bargaining agreements and to abide by the terms therein. The Board's Order requires the Company to recognize and bargain with the Union as the representative of its employees in the appropriate unit, to sign and implement the new collective-bargaining agreement and give it retroactive effect, to make its employees whole for any losses resulting from the Company's refusal to bargain, and to post appropriate notices.

Two overriding issues are presented: (I) whether the Company was, in fact, a member of the Multi-Employer Association during the relevant period herein, and (II) whether Local 509 represented a majority of the employees in the relevant unit at the time of the Company's refusal to sign the new collective-bargaining agreement and to abide by its terms.

## I.

### The Company's Membership in the Multi-Employer Association.

The Company contends that it was not a member of the Multi-Employer Association during the relevant periods herein because (1) the Company did not express an unequivocal intent to be bound by the multi-employer unit for purposes of collective bargaining; (2) Local 509 failed to give timely consent to the Company's inclusion in the multi-employer unit; (3) the Company's employees were not effectively merged into the Multi-Employer Association because a majority had not consented to representation by Local 509; and (4) the Company effectively withdrew from the bargaining unit. We reject these contentions for the reasons outlined below.

### (1) *Evidence of Unequivocal Intent*

■ Paragraph 3 of the Application, quoted *supra*, clearly and unequivocally states that the Multi-Employer Association is "hereby designated as the sole and exclusive collective bargaining representative for and on behalf of the undersigned." Likewise, Article X of the By-laws gives the Multi-Employer Association the authority to act as the Company's sole representative for purposes of collective bargaining.

Osborne claimed that he did not read the Application before signing it. Instead, the Company asserted that it applied for membership in the Multi-Employer Association merely to obtain certain trade manuals and documents. The Administrative Law Judge found that this testimony was not credible, and the Board adopted that finding. This Court will not disturb credibility resolutions unless a clear preponderance of evidence in the record shows that they are incorrect. *NLRB v. Pacific Intern. Rice Mills, Inc.*, 594 F.2d 1323, 1326 (9th Cir. 1979). Given the fact that the Application was only a one-page document on which the type is reasonably large and uniform, it is somewhat difficult to believe that Osborne failed to notice Paragraph 3 which rests conveniently in the center of the page. Moreover, there was testimony that the manuals and docu-

ments the Company allegedly sought were already available to it with no requirement that the Company join the Multi-Employer Association. In sum, there is substantial evidence to support the Board's finding that the Company intended to become part of the multi-employer unit and to delegate authority to the Multi-Employer Association to negotiate on the Company's behalf.

### (2) The Union's Consent

The Company correctly points out that before a particular employer can become part of an established multi-employer unit, the "already committed parties", which includes the union, must agree to the new-comer's participation. *The Hammet Co. Inc.*, 206 N.L.R.B. No. 56 at 680 (1973). The Company contends that there was no timely consent by Local 509 herein as it was not aware of the Company's membership in the Multi-Employer Association until August, 1976, after the conclusion of the negotiations for a new collective-bargaining agreement.

▮ No specific formalities are required to evidence an intent by a union to accept an employer bargaining group. *See NLRB v. Bagel Bakers Council of Greater New York*, 434 F.2d 884, 886–87 (2d Cir.), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971). Similarly, no formal or special evidence of acceptance is required of the union when a new employer is added to the unit so long as the union has an opportunity to voice its objections to the newcomer but does not.[8]

▮ In the present case, contrary to the Company's claim, Local 509 was given a list of the Multi-Employer Association's members, which included the Company, in June of 1976. At no time herein did Local 509 object to the Company's inclusion in the multi-employer unit. Indeed, after the new collective-bargaining agreement had been reached, the Union sought the Company's signature on the new contract. We find, as

did the Board, that such facts evidence the necessary consent by the Union to the Company's inclusion within the Multi-Employer Association. As to the Company's contention that the consent must be "timely," we find no case that discusses this requisite, if it exists at all. The Board did not find the Union's consent to be untimely, and we shall not disturb that determination, essentially factual, in the circumstances of this case.

### (3) Employees Merged Into Multi-Employer Association

▮ Generally, an employer may not unilaterally and without the express or implied consent of its employees bind them to representation in a multi-employer unit. *See, e. g., Mohawk Business Machines Corp.*, 116 N.L.R.B. No. 28 at 249 (1956). The Company contends that its employees were not effectively merged into the Multi-Employer Association because the Union did not enjoy majority status at the time the Company applied for membership and was accepted into the multi-employer unit. The argument must be rejected.

As the Supreme Court noted less than two years ago, "It is also undisputed that when the union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *NLRB v. Iron Workers*, 434 U.S. 335, 349–50, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). *See also id.* at 351 n.12, 98 S.Ct. at 660 n.12 ("One-time majority status, coupled with a union security clause that has been enforced, gives rise to a rebuttable presumption of continued majority status, in the Board's view. See *R.J. Smith*, 191 N.L.R.B., at 695."). It is clear from the record in this case that a majority of the Company's employees became Local 509 members shortly after the signing of the pre-hire agreement and well before the

---

8. *Cf. Fairmont Foods Co. v. NLRB*, 471 F.2d 1170, 1173 (8th Cir. 1973) (where it was held that a union's silence as to an employer's withdrawal from a multi-employer unit after receiving notice thereof, coupled with its continuation of normal relations with the remaining employers, constituted an "implied consent" to the withdrawal).

Company became a member in the Multi-Employer Association.[9] Thus, once a majority of the Company's employees joined the Union, a rebuttable presumption of the Union's majority status was created. We also note that the union security clause, a part of the pre-hire agreement, was enforced, at least initially, after the agreement was entered into.

In addition, however, the Company contends that this presumption was successfully rebutted by evidence indicating that only a minority of its employees were Union members when, for example, the Company's application for membership in the multi-employer unit was approved in December of 1975. This evidence alone, however, is not sufficient to rebut the presumption of majority status in the circumstances of this case. It is well established that union membership is not always an accurate barometer of union support. *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 307 (9th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979); *Sahara-Tahoe Corp. v. NLRB*, 581 F.2d 767, 772 (9th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2837, 61 L.Ed.2d 284 (1979); *NLRB v. Vegas Vic, Inc.*, 546 F.2d 828, 829 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1978). The Board concluded that the Company did not rebut the presumption of majority status applicable here. We hold that the Board's determination in this respect is supported by the evidence.

### (4) *Attempt to Withdraw*

Prior to the commencement of negotiations, either the Union or the individual employer may unilaterally withdraw from a multi-employer bargaining relationship if adequate written notice is given that evinces an unambiguous intent to withdraw. *NLRB v. Beck Engraving Co., Inc.*, 522 F.2d 475, 481 (3rd Cir. 1975). It is well established, however, that withdrawal from a multi-employer unit is untimely if attempted after the commencement of bargaining

negotiations. *See, e. g., McAx Sign Co., Inc. v. NLRB*, 576 F.2d 62, 67–68 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *NLRB v. Central Plumbing Co.*, 492 F.2d 1252, 1255 (6th Cir. 1974); *NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55, 57 (10th Cir. 1966). "This rule is intended to minimize disruption of the bargaining process by preventing an employer from using the threat of withdrawal from negotiations as a 'bargaining lever.'" *McAx Sign Co., supra*, at 68. *See also NLRB v. Sheridan Creations, Inc.*, 357 F.2d 245, 247–48 (2d Cir. 1966).

 The Company's attempt to withdraw from the multi-employer unit was not successful for a number of reasons. First, the withdrawal was untimely as a matter of law since the negotiations between Local 509 and the Multi-Employer Association commenced on May 20, 1976, and Local 509 did not consent to the Company's withdrawal. There was, in fact, no evidence that the Company ever notified the Union of its intent to withdraw prior to the time that the new collective-bargaining agreement was finalized. We note also that the Company failed to secure the approval of the Multi-Employer Association's Board of Directors as required under Article VI, Section 4 of the By-laws. Moreover, the withdrawal was precluded by this portion of the By-laws which required continued membership for four months prior to and after the termination date of any collective-bargaining agreement covering a member's employees of which the Multi-Employer Association was also a party.

### (5) *Impasse in Negotiations*

 During the course of negotiations, withdrawal from a multi-employer bargaining unit is permissible if an "unusual circumstance" occurs. *NLRB v. Associated Shower Door Co.*, 512 F.2d 230, 232 (9th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). The only unusual circumstance, as the term has been used by

---

**9.** Even the Company concedes that Local 509 members constituted a majority of its work complement in two months during the effective period of the bargaining agreement and before the Company applied for and became a member in the Multi-Employer Association.

the Board and the courts, that is raised by the Company is an alleged impasse in negotiations.[10] The Courts of Appeals have consistently recognized an impasse in negotiations as justification for a unilateral withdrawal from a multi-employer unit. *E. g., NLRB v. Acme Wire Works, Inc.*, 582 F.2d 153, 156–57 (2d Cir. 1978); *NLRB v. Beck Engraving Co., Inc.*, 522 F.2d 475, 483 (3rd Cir. 1975); *NLRB v. Associated Shower Door Co.*, 512 F.2d 230, 232 (9th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); *NLRB v. Hi-Way Billboards, Inc.*, 500 F.2d 181, 182–83 (5th Cir. 1974); *Fairmont Foods Co. v. NLRB*, 471 F.2d 1170, 1172–73 (8th Cir. 1972).

The Administrative Law Judge, however, found that there was no evidence of an impasse. The Board adopted this finding, and we cannot conscientiously hold that the finding is not supported by substantial evidence. The fact that an employer is not happy with the result of group bargaining does not indicate an impasse. *NLRB v. Central Plumbing Co.*, 492 F.2d 1252, 1254 (6th Cir. 1974). The period between May 20, 1976 and August 9, 1976 is not alleged to have been an overly lengthy time for the bargaining. The Company does not claim that it was suffering economic hardship as a result of the length of the negotiations. Moreover, until August 5 when the deadlock as to wages became apparent, there is little, if anything, in the record to indicate that the negotiations had not been proceeding in a normal fashion. Further, the parties had previously agreed upon a binding method of resolving any deadlocks, *i. e.*, submission of the issue to the NJAB. While the Company contends that the Union had threatened to strike if the NJAB itself deadlocked, the mere threat of a strike is not an unusual circumstance justifying withdrawal in the circumstances of this case. Finally, we note that at the time the Company notified the Multi-Employer Association of its intent to withdraw (July 14, 1976 letter), there clearly was no evidence of any impasse. *Cf., NLRB v. Johnson Sheet Metal, Inc.*, 442 F.2d 1056, 1060 (10th Cir. 1971) (attempt to withdraw came after negotiations had resumed and whatever impasse may have existed had ended).

## II.

The Union's Majority Status at the Time of the Company's Refusal to Sign the New Agreement.

As recently stated by our own court,

> To sustain an 8(a)(5) charge, the General Counsel must show the union represented a majority of the unit employees when the employer refused to bargain. The Board employs two presumptions obviating an evidentiary showing of majority status. For a reasonable time, usually one year, after certification or voluntary recognition, majority support is irrebuttably presumed absent "unusual circumstances." After one year, the presumption becomes rebuttable. Absent sufficient countervailing proof, the presumption establishes, without more, the employer's duty to bargain. *NLRB v. Tesoro Petroleum Corp.*, 431 F.2d 95, 97 (9th Cir. 1970).
>
> \* \* \* \* \* \*
>
> The presumption is rebutted if the employer shows, by clear, cogent, and convincing evidence, that the union was in the minority or that the employer had a good faith reasonable doubt of majority support at the time of the refusal. (footnotes omitted).

*NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 (9th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979). *Accord, Sahara-Tahoe Corp. v. NLRB*, 581 F.2d 767, 769 (9th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2837, 61 L.Ed.2d 284 (1979).

---

10. The Company contends that another "unusual circumstance" existed in that it had merely been a nominal, non-participating member in the Multi-Employer Association for a short time prior to its request to withdraw. No case supporting this position is cited, and we do not find that such facts constitute sufficient reason or justification to permit a unilateral withdrawal during negotiations.

The Company contends that the Union did not enjoy a presumption of majority status at the relevant times herein, and that even if such a presumption did exist, the Company effectively rebutted the presumption by pointing out that only a minority of its employees were Local 509 members. These arguments, of course, parallel those made in connection with the Company's application for membership and acceptance into the Multi-Employer Association. *See* Part I(3), *supra.* We reject the Company's arguments in this context for similar reasons.

The contentions presented in the Petition for Review are rejected, and the Board's Order will be

ENFORCED.