NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CUSTOM SHEET METAL & SERVICE
CO., INC., Respondent.

No. 80–1199.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 29, 1981.

Decided Dec. 14, 1981.

R. Michael Smith, Atty., N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief), for petitioner.

Charles W. Ellis of Ellis & Frates, Oklahoma City, Okl., for respondent.

Before HOLLOWAY and DOYLE, Circuit Judges, and KUNZIG,* Judge.

KUNZIG, Judge.

This matter comes before the court on application of the National Labor Relations Board for enforcement of its order[1] pursuant to section 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e). The Board has found Custom Sheet Metal & Service Co., Inc. in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5),[2] based upon its refusal to sign a collective bargaining agreement negotiated by the Sheet Metal Contractors' Association of

Oklahoma, Inc., and the Sheet Metal Workers, Local Union 124. The critical issue in the case is whether "unusual circumstances" existed such as to justify the Company's withdrawal from the Association shortly before agreement on the contract was reached. We conclude that unusual circumstances did exist, and therefore deny enforcement.

## I. Background

In January of 1975, Billy Herron, a union member and journeyman sheet metal worker in Oklahoma City, Oklahoma, purchased the Stalcup and Kiser sheet metal shop and incorporated the business as the Custom Sheet Metal & Service Co., Inc. ("Company"). Shortly thereafter, the Company voluntarily agreed to abide by the terms of the collective bargaining agreement then in effect between Stalcup and Kiser and Sheet Metal Workers, Local Union 124 ("Union"). The Company soon became a member of Sheet Metal Contractors' Association of Oklahoma, Inc. ("Association"). At this time the Company was engaged principally in the sheet metal building and construction industry, as were most of the members of the Association. When the initial contract expired, a new contract was executed between the Association and the Union to be effective from July 1, 1975 to June 30, 1977. This agreement provided that only journeyman and apprentice union sheet metal workers would be employed to perform sheet metal work for the Company and that union membership was required within eight days of commencing employment.

During the two-year term of the contract the Company's business expanded, and its operation began to change from building and construction work to the assembly-line fabrication of sheet metal products. This trend continued to the point where 95% of

---

\* Honorable Robert L. Kunzig, of the United States Court of Claims, sitting by designation.

1. The Board's decision is reported at 243 NLRB No. 142 (1979).

2. These sections provide:
    (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .
    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

the Company's business involved the in-plant manufacture of sheet metal products (primarily restaurant equipment), and only 5% involved on-site installation.[3] In response to this change in its business operation, the Company president approached the Union business agent to negotiate some modifications in the contract then in effect. The two men met—Billy Herron for the Company, and Parker Sneed for the Union—and the net result of their discussion was a "Kitchen Equipment Addendum" which reduced the wage rate to be paid to assembly-line employees of the Company and which extended the time in which employees were to become members of the Union from eight to thirty days.[4] The Company was the *only* member of the Association allowed by the Union to take advantage of the cost-saving provisions of the "Kitchen Equipment Addendum."[5]

In March of 1977 the Union notified the Association of its desire to open negotiations for a new contract to succeed the 1975–77 agreement. The Association subsequently agreed to meet with the Union, and Billy Herron, the Company president, was appointed to the Association's bargaining committee as representative for those businesses involved in the assembly-line manufacture of restaurant equipment and specialty products.

The first negotiating session took place on May 10, 1977, and among the Association's proposals was a request that provisions similar to those included in the "Kitchen Equipment Addendum" be added to the new contract. The Union rejected this proposal at the meeting, and consistently rejected the proposal at bargaining sessions held on May 17 and 31, and June 7, 14, 21, 23, and 24. Despite the Union's refusal to incorporate the "Kitchen Equipment Addendum" into a new agreement, the parties did agree to a contract at the bargaining session on June 24, 1977, subject to Union ratification. At the membership meeting on June 30, 1977, the Union rejected the Association's offer and went on strike the next day.

During the next few days Billy Herron, the Company president, was contacted by the Company's major customer, Sonic Industries, regarding the availability of certain kitchen equipment which had been previously ordered by Sonic.[6] Herron informed Sonic that 30 of his 32 production employees were on strike, but that another bargaining session was scheduled for July 5. The Association and Union representatives met on July 5, but were unable to reach agreement despite the assistance of the Federal Mediation and Conciliation Service.

On July 6 Sonic Industries again contacted Herron and informed him that it intended to purchase the items it needed, and its future requirements, from other suppliers. Faced with the loss of a customer which

---

**3.** The parties do not dispute the fact that the Company's business operation changed dramatically during the 1975–77 period. The Administrative Law Judge found that as of the time of the hearing, the Company "had not bid on any large or new construction jobs for over 2 years."

**4.** The contract in effect during 1975–77 stated, "The employer agrees that none but journeyman and apprentice sheet metal workers shall be employed on any work described in Article 1." Article 1 was broadly drafted and covered both installation and manufacturing work. The ultimate effect of this provision was to require the Company to pay the wage scale applicable to journeyman and apprentice sheet metal workers to its assembly-line employees, even though the latter group performed only relatively simple tasks. Because the Company's operation had changed to the point where 95% of its work was in manufacturing and only 5%

in installation, an accommodation in the contract was deemed necessary for the Company to be competitive against non-union manufacturers of restaurant equipment. The "Kitchen Equipment Addendum" allowed the Company to hire relatively unskilled employees for its assembly-line operation and to pay those employees at the initial rate of 60% of the journeyman's base pay salary.

**5.** The "Kitchen Equipment Addendum" was apparently never reduced to writing, but was honored by both the Company and the Union.

**6.** The Administrative Law Judge found that "as of July 6, between $80,000 and $125,000 worth of work for Sonic [was] in progress at Respondent's plant and the items being produced *for* Sonic could only be used *by* Sonic, so in that sense, these items were custom made."

provided fully 75% of its business,[7] and the apparent lack of meaningful progress in the bargaining sessions between the Union and the Association, the Company withdrew from the Association on July 6, thereby terminating the Association's bargaining authority for the Company. The Union was promptly informed of this action by telegram.[8] On July 7 the remaining members of the Association met again with the Union representatives, and after a 12-hour session an agreement was reached which was accepted by the Union membership on July 11, 1977.

Shortly thereafter, the Union representative contacted Herron to obtain the Company's adoption of the new agreement. Herron refused to sign the agreement which provided that only journeyman and apprentice sheet metal workers would be employed by the Company,[9] a provision which had been previously modified vis-a-vis the Company by the "Kitchen Equipment Addendum" so as to allow the Company to pay its assembly-line employees less than the journeyman pay scale.

In response to the Company's refusal to sign the agreement, the Union filed an unfair labor practice charge with the Board on July 17, 1977. In a two-page order affirming the findings of the Administrative Law Judge, the Board found that the Company's withdrawal from the Association bargaining unit and its refusal to execute the contract for the 1977–79 period violated sections 8(a)(1) and (5) of the National Labor Relations Act. The Company has been ordered to provide various relief, and most notably has been ordered to execute the 1977–79 contract, but not to give effect to the provision requiring that the Company employ only journeyman and apprentice sheet metal workers (Article III) and the eight-day Union security clause (Article V). The Board's order does impose the wage scale applicable to journeyman and apprentice sheet metal workers on the Company, but leaves unresolved the exact job classification of the Company's assembly-line employees and the length of time in which Union membership is required as a condition of employment.

## II. *The Right to Withdraw from Multi-Employer Associations*

The applicable rules governing multi-employer bargaining have developed on a case-by-case basis with little Congressional interference.[10] As enunciated by the Board in its seminal opinion in *Retail Associates, Inc.*, 120 N.L.R.B. 388 (1958), once negotiations between a multi-employer association and a union have begun, none of the parties may withdraw from such bargaining without the consent of the opposing party, absent "unusual circumstances." This formulation has been widely adopted by the circuits which have considered the question,[11]

7. The Administrative Law Judge found that "[a]t this point in time Sonic was the purchaser of 75 percent of Respondent's production."

8. The telegram stated, "Custom Sheet Metal and Service Co., Inc., permanently withdraws the authority of Sheet Metal Contractors Association of Oklahoma, Inc., to represent it in all collective bargaining matters effective immediately."

9. The contract as negotiated also contained an eight-day Union security clause in contrast to the thirty-day clause provided for in the "Kitchen Equipment Addendum."

10. *See, e.g., NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 95–96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957) ("The inaction of Congress with respect to multi-employer bargaining cannot be said to indicate an intention to leave the resolution of this problem to future legislation."); *Retail Clerks Union, No. 1550 v. NLRB*, 330 F.2d 210, 212 (D.C.Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964). ("This later phenomenon [a multi-employer bargaining unit] is nonstatutory in character and thus lacks the definiteness in terms of nature and obligation which it might have if Congress had expressly dealt with it.")

11. *See NLRB v. Acme Wise Works, Inc.*, 582 F.2d 153 (2d Cir. 1978); *NLRB v. Beck Engraving Co., Inc.*, 522 F.2d 475 (3d Cir. 1975); *McAx Sign Co., Inc. v. NLRB*, 576 F.2d 62 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *NLRB v. Siebler Heating & Air Conditioning*, 563 F.2d 366 (8th Cir. 1977), *cert. denied*, 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978); *Authorized Air Conditioning Co., Inc. v. NLRB*, 606 F.2d 899 (9th Cir. 1979), 606 F.2d 899 (9th Cir. 1978), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980).

and is clearly the law in the Tenth Circuit. *NLRB v. Tulsa Sheet Metal Works, Inc.,* 367 F.2d 55, 57 (10th Cir. 1966). Thus, the central issue in this case is whether "unusual circumstances" justified the Company's withdrawal, and whether the Board's finding to the contrary is supported by substantial evidence.

█ The Courts of Appeal of the various circuits have recognized three situations which constitute "unusual circumstances" sufficient to justify an employer's withdrawal from a multi-employer association after bargaining has begun: (1) extreme financial hardship threatening the existence of the employer as a viable business entity,[12] (2) fragmentation of the multi-employer bargaining unit,[13] and (3) bargaining impasse.[14]

### III. Application of the "Unusual Circumstances" Standard

█ We recognize at the outset of our analysis that a combination of events—a striking labor force, a threat from the Company's major customer to purchase ordered goods elsewhere, and an apparent lack of progress in negotiating a new "Kitchen Equipment Addendum"—left the Company in an extremely difficult financial situation. Suddenly faced with the imminent loss of a customer which purchased 75% of its production, and having lost other customers since the initiation of the strike,[15] the Company withdrew from the Association and gave prompt notice of this decision to its employees and the Union. We believe the evidence in the case justifies the Company's withdrawal on the first theory encompassed by the "unusual circumstances" standard— *extreme financial hardship* threatening the existence of the employer.

The Board does not contest the determination that the Company was faced with the immediate loss of three-fourths of its business, but reaches the conclusion that such circumstances do not threaten the very existence of the Company. We disagree, for it appears to us that the impending loss of 75% of the Company's business *does* threaten its very existence, especially in an era of high interest rates and heavy debt financing.[16] The Board's decision does not indicate the percentage of business loss which would satisfy the "extreme financial hardship" test, but if 75% was deemed insufficient, one can only wonder as to the percentage the Board would have found sufficient—85%, 90%, 95% . . . 100%?

The timing of Billy Herron's decision to withdraw his Company from the Associa-

**12.** *See NLRB v. Spun-Jee Corp.,* 385 F.2d 379 (2d Cir. 1967) (remand to NLRB); *Spun-Jee Corp.,* 171 N.L.R.B. 557 (1968) (adopts extreme financial hardship exception). *See also NLRB v. Siebler Heating & Air Conditioning Inc.,* 563 F.2d 366, 371 (8th Cir. 1977), *cert. denied,* 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978) ("While we do not view this as the principal grounds for withdrawal, the record reveals that non-union employers were getting a larger and larger share of the available residential work and genuine economic distress was only a step removed.")

**13.** *See NLRB v. Southwestern Colorado Contractors Assn.,* 447 F.2d 968 (10th Cir. 1971).

**14.** *See NLRB v. Independent Assn. of Steel Fabricators, Inc.,* 582 F.2d 135 (2d Cir. 1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979); *NLRB v. Beck Engraving Co., Inc.,* 522 F.2d 475 (3d Cir. 1975); *NLRB v. Hi-Way Billboards, Inc.,* 500 F.2d 181 (5th Cir. 1974); *Fairmont Foods Co. v. NLRB,* 471 F.2d 1170 (8th Cir. 1972); *NLRB v. Associated Shower Door Co., Inc.,* 512 F.2d 230 (9th Cir.),

*cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); *NLRB v. Tulsa Sheet Metal Works, Inc.,* 367 F.2d 55 (10th Cir. 1966). *Contra, NLRB v. Bonanno Linen Serv.,* 630 F.2d 25 (1st Cir. 1980), *cert. granted,* 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981).

**15.** In his findings of fact, the Administrative Law Judge noted that "with the initiation of the strike, Respondent lost a number of its smaller customers."

**16.** The decision of the Administrative Law Judge recognized that "[r]espondent was concerned because it had borrowed money to finance its operations and was paying interest on the money borrowed." The record also reflects that the Company was particularly concerned with losing business to out-of-town manufacturers which were not shut down by the strike. The other members of the Association, all involved in the building and construction industry, were not similarly faced with this competitive threat.

tion, which came on the heels of Sonic's call informing him it had located other equipment suppliers, also indicates that Herron was motivated by vital economic considerations in his decision rather than anti-union sentiment. Indeed, there is *no* evidence that at the time of Herron's decision to withdraw he was motivated by considerations other than the financial position of the Company. We note that Herron had been a Union member himself, and voluntarily entered the Company into a collective bargaining agreement with the Union in 1975. The evidence indicates that the Company was willing to work with the Union in reaching agreement on a new "Kitchen Equipment Addendum." As the United States Court of Appeals for the Eighth Circuit recently noted, "[T]he soundness of a withdrawal from a multi-employer unit is to be tested by considering the *actual motivation* of the employer seeking to withdraw from the unit." *NLRB v. Custom Wood Specialties, Inc.*, 622 F.2d 381, 385 (8th Cir. 1980) (emphasis added). Such reasoning, applied to this case, dictates a result in favor of the Company in view of the perilous economic conditions facing the Company and the total lack of evidence of bad faith towards the Union.

The facts in this case are distinguishable from those facing this court in *NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55 (10th Cir. 1966), where the employer's "unusual circumstances" argument was rejected. In *Tulsa Sheet Metal*, the firm which withdrew from the multi-employer association had been a solid member of the association for twelve years at the time of its withdrawal. By contrast, the Company in the case at bar had been a member of the Association for only two years, during which time its business operation radically changed from on-site construction to in-plant manufacturing. Even though Custom Sheet Metal was a party to the contract executed between the Association and the Union during the 1975–77 period, as a result of the transformation in its operation, the Company reached agreement with the Union on a "Kitchen Equipment Addendum" which significantly modified the wage, job classification, and union security provisions applicable to the other members of the Association. This modification of the contract, which applied to one member of a multi-employer Association consisting of approximately 44 members, indicates that the Union was aware of the unique position of the Company in the Association and suggests that the Company's withdrawal was indeed prompted by "unusual circumstances." [17]

Finally, and most significant, is the fact that the Company in this case was faced with serious economic difficulties due to the imminent loss of 75% of its business, a situation *not* present in the *Tulsa Sheet Metal* case. In summary, *Tulsa Sheet Metal* is simply a different case from the one now before the court. The facts are distinguishable—the rejection of the "unusual circumstances" argument not applicable to the case at bar.

Apart from the issue of whether "unusual circumstances" existed, there is a serious question in this case as to whether the Board's remedy can properly be imposed upon the Company. Because the Company is no longer engaged in the building and construction industry, the Company would ostensibly violate section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), by executing a contract which limits employment to those with "minimum training or experience qualifications" (*i.e.*, journeyman and apprentice sheet metal workers—Article III) and which contains an eight-day union security clause (Article V). In recognition of the fact that the contract contains provisions which are illegal [18] as applied to a

---

**17.** *Cf. Retail Clerks Union, No. 1550 v. NLRB*, 330 F.2d 210, 216 (D.C.Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964) ("[T]he evidence showed a melange of group and individual negotiation and agreement, carried on over such a period of time, as to suggest a commonly accepted flexibility in the format of bargaining which would not automatically outlaw every departure from the fold.")

**18.** *See NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55, 58 (10th Cir. 1966) ("The June 21 contract contains two clauses relating to union

manufacturing concern, the Board has ordered the Company to execute the agreement, but not to give effect to the illegal provisions. The Board has cited our decision in *Tulsa Sheet Metal* as authority for this remedy, but here again we reject the Board's contention.

We recognize that the governing standard for determining whether a Company should be ordered to execute a collective bargaining agreement was enunciated by this court in *Tulsa Sheet Metal*: "Employment contracts should not be completely obliterated because some provisions are beyond the legal limits of the parties' bargaining power, unless such illegal provisions permeate the complete contract to such an extent as to affect its enforceability entirely."[19] The *Tulsa Sheet Metal* court, relying in part upon a "savings and severability" provision in the contract, went on to hold that provisions regarding subcontracting and union security were "not basic to the whole scheme of the contract."[20]

In this case, the illegal provisions regard union security and, more importantly, the minimum qualifications for commencing employment. The contract in question refers to only two classifications of workers who can be employed by the company—journeyman, and apprentice sheet metal workers—and other sections of the contract are entwined with this classification, including the wage scale to be paid by the Company. If any provision of a collective bargaining agreement is truly vital, it is a provision pertaining to the classification of employees, and this seems especially true when the wage scale in a contract is directly tied to the classification scheme. Moreover, the contract in the case at bar contains no "savings and severability" clause, unlike the agreement in *Tulsa Sheet Metal*. We seriously question the wisdom of ordering the Company to sign a contract, but not to give effect to a provision regarding minimum employee qualifications which forms the very foundation on which the agreement rests. As the Supreme Court recognized in *NLRB v. Rockaway News Supply Co., Inc.*, 345 U.S. 71, 78, 73 S.Ct. 519, 523, 97 L.Ed. 832 (1953), "[t]here may be cases where a forbidden provision is so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entirety." We believe that such a case is now before us,[21] in contrast to that facing the court in *Tulsa Sheet Metal*.[22]

In summary, we conclude that the Company's withdrawal from the Association was justified on the ground that it was faced with extreme financial hardship threatening its existence as an employer. Unlike *Tulsa Sheet Metal*, here there is ample evidence in the record of extreme financial hardship sufficient to invoke the "unusual circumstances" standard. Moreover, the Board has misread our decision in *Tulsa Sheet Metal* in formulating a remedy in the case at bar. We find the remedy proffered by the Board inapplicable on the ground that a provision of the contract which the Board has excused the Company from executing "permeate[s] the complete contract to such an extent as to affect its enforceability entirely."[23] Finally, we reiterate the lack of even a scintilla of evidence of anti-union sentiment on the Company's behalf at the time the decision was made to withdraw the Company from the Association. Although the Board's decision is enti-

---

security and subcontracting, both of which are admittedly *illegal*.") (Emphasis added.)

**19.** 367 F.2d at 59.

**20.** *Id.* See also *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953).

**21.** *See, e.g., Stackhouse Oldsmobile, Inc. v. NLRB*, 330 F.2d 559, 560 (6th Cir. 1964) ("We cannot believe that Congress intended to make it an unfair labor practice for an employer to refuse to sign a collective bargaining agreement containing a union security clause which, by its literal terms, could require a violation of § 8(a)(3) and § 8(b)(2) of the Act.")

**22.** Even our decision in *Tulsa Sheet Metal* concedes that "not all provisions of a collective bargaining agreement are severable." 367 F.2d at 59.

**23.** *Id.*

tled to considerable deference by a reviewing court, where the Board's order has "no reasonable basis in law" or is "fundamentally inconsistent with the structure of the Act" it should not be enforced. *NLRB v. Bartlett-Collins Co.,* 639 F.2d 652, 655 (10th Cir. 1981), citing *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

For the reasons stated above, we hold on these facts that "unusual circumstances" clearly existed so as to justify the Company's withdrawal from the multi-employer association bargaining unit and the Company's subsequent refusal to execute the 1977–79 agreement. We find that the Board's decision to the contrary is not supported by substantial evidence on the record as a whole,[24] and therefore conclude that the Company did not violate sections (8)(a)(1) and (5) of the National Labor Relations Act as charged by the Board.

Enforcement of the Board's order is denied.