**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARINE MACHINE WORKS, INC., Respondent.**

No. 79–3938.

United States Court of Appeals, Fifth Circuit. Unit A

Jan. 30, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, Christopher W. Katzenbach, Atty., N.L.R.B., Washington, D.C., for petitioner.

Bonnie Cressey, Galveston, Tex., for respondent.

V. Scott Kneese, Robert F. McBee, Houston, Tex., for intervenor D & P Investment Co.

Before INGRAHAM, GEE and TATE, Circuit Judges.

INGRAHAM, Circuit Judge:

Pursuant to section 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e) (1976), the National Labor Relations Board (the Board) seeks enforcement of its order issued on August 6, 1979, against Marine Machine Works, Inc. (Marine).[1] The Board based its order, issued upon a stipulated record, on its conclusion that Marine violated sections 8(a)(1) and (5), 29 U.S.C. § 158(a)(1), (5) (1976), of the Act by unilaterally withdrawing from a multiemployer bargaining unit after negotiations had begun but after the parties had reached impasse, and by refusing to execute the collective bargaining contract agreed upon by a union and the multiemployer association. The Board accordingly entered a cease–and–desist order requiring Marine

---

1. The Board filed its application for enforcement on December 4, 1979. On January 18, 1980, the court granted the motion of D&P Investment Co., Inc. for leave to intervene. D&P sought intervention because of its potential obligation, as a successor to Marine, for remedying any unfair labor practices committed by Marine. The Board has not formally charged D&P with any liability and D&P does not admit to being a successor to Marine for purposes of derivative liability. D&P asserts that it filed an intervenor's brief since the allegedly defunct Marine failed to make any defense to the Board's order. We, of course, express absolutely no opinion on any of these matters.

to comply with the terms of the collective bargaining contract and to make whole any employees who suffered loss as a result of the violation. We enforce that order.[2]

## I.

The facts in this case are not in dispute. Marine was a member of the Galveston Area Repairers Council (the Council), an employer association that engages in multiemployer collective bargaining with the International Association of Machinists and Aerospace Workers, AFL–CIO (the Union) on behalf of its employer members. The relevant activities all occurred in 1978. On January 18 the Council and the Union commenced negotiations for a new contract to replace the existing one due to expire on January 24. After an extension of the contract until January 26, the contract expired without the parties reaching an agreement on a new one. On January 26 the employees of the Council's member employers voted to reject the Council's contract proposals. On January 27 the employees went out on strike.

Negotiations continued during the strike. On February 20 the employees again rejected contract proposals put forth by the Council and elected to remain on strike. On March 6, while the negotiations between the Council and the Union were at an impasse, Marine by formal notice withdrew its membership in the Council and so advised the Union by letter. Marine explicitly based its withdrawal on the fact of impasse. Marine also expressed its willingness to negotiate with the Union on an individual basis and invited the Union to suggest dates on which such negotiations might be held. On March 10 the striking employees voted to accept the Council's contract proposals and to end the strike. The new multiemployer agreement became effective on March 10, 1978, for a term of three years. On March 14 Marine refused to sign the new multiemployer contract and continued to refuse to abide by its terms and conditions.

■ The Board's decision that Marine violated sections 8(a)(1) and (5) of the Act, with respect to both the unilateral withdrawal and the refusal to execute the contract, flowed from its conclusion that Marine's putative withdrawal from the Council on March 6 was unlawful. Before the Board, the General Counsel contended that the occurrence of a bargaining impasse does not constitute an unusual circumstance that will justify an employer's unilateral withdrawal from multiemployer bargaining once negotiations have begun. Marine argued that case law in this circuit and others establishes that impasse is indeed a sufficient condition to exonerate a withdrawal that would otherwise violate the Act. The parties before this court press these same arguments. Thus, the question we must decide is whether unilateral withdrawal by a member employer from a multiemployer bargaining unit solely because of impasse constitutes a refusal to bargain in violation of sections 8(a)(1) and (5) of the Act. We hold as a matter of law[3] that it does.

## II.

Our resolution of this issue requires consideration of the Board's policy toward and

2. On February 11, 1980, following Marine's failure to file an answer to the Board's application for enforcement of its order, the Board moved for judgment by default. On March 6, 1980, the court ordered the Board's motion carried with the case. In the light of intervenor D&P Investment Co.'s able defense on the merits of this case, and considering that the Board may look to D&P for remedial compliance with its order, we now deny the Board's motion for judgment by default.

3. There were no facts, either elemental or inferential, to be found in this case. The Board decided the case on a stipulation of facts entered into by all parties. Thus, the standard of substantial evidence on the record as a whole mandated by § 10(e) of the Act, 29 U.S.C. § 160(e) (1976), for appellate review of findings of fact is not the appropriate standard in this case. *Cf. NLRB v. Marcus Trucking Co.*, 286 F.2d 583 (2d Cir. 1961) (Friendly, J.) (question whether an employer who has made a valid collective bargaining agreement with a Board-certified union and who then recognizes another union during the period of contract–bar protection thereby violates the Act is question of law).

rules governing multiemployer bargaining. The Board has consistently held that employers may not, absent unusual circumstances, withdraw from multiemployer bargaining units once negotiations have commenced. *Retail Associates, Inc.*, 120 N.L.R.B. 388, 395 (1958). Prohibiting such withdrawals contributes to the stability of multiemployer units and prevents the use of the scope of the bargaining unit as a bargaining lever to secure an economic advantage for one side over the other. *See NLRB v. Sheridan Creations, Inc.*, 357 F.2d 245, 248 (2d Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). This furthers the substantial public interest served by multiemployer bargaining, which the Supreme Court has characterized as a "vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *NLRB v. Truck Drivers Local Union No. 449 (Buffalo Linen)*, 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957).

The Board, however, has not taken an inflexible position on this matter. Under the Board's ground rules laid out in *Retail Associates* any party–employer or union–is free to withdraw from the multiemployer unit prior to the date set for renegotiation of an existing contract or before the parties begin negotiations toward a new contract. Once the parties begin negotiations, however, a party may withdraw only if unusual circumstances exist or if both the union and the employer's association agree to the withdrawal.

By allowing unlimited withdrawal prior to the start of negotiations, the Board gives each party an opportunity to go its separate way at a time when the withdrawal will not substantially jeopardize the multiemployer bargaining process. The Board also protects a party's interest in striking its own individual bargain by refusing to certify a union as representative of employees in a multiemployer unit unless the employers have explicitly agreed to such a unit or a history of multiemployer bargaining demonstrates implicit agreement.[4] Also, the Board protects the employer's interest in bargaining on an individual basis by refusing to bind an employer to multiemployer bargaining absent evidence of clear and unambiguous consent to inclusion in the multiemployer bargaining unit.[5]

Conversely, after negotiations have begun, the parties are required to honor their commitment to the process of multiemployer bargaining, which they freely elected. Thus, the Board then allows withdrawal only if mutual consent is given or in the presence of a limited number of unusual circumstances. One such circumstance exists when a company faces extreme financial pressures, such as impending bankruptcy. Another unusual circumstance justifying unilateral withdrawal is when the multiemployer unit becomes extremely fragmented, for example, through several withdrawals occurring by mutual consent. Significantly, however, the Board has repeatedly and explicitly held that impasse is not an unusual circumstance justifying unilateral withdrawal.

The Board has previously argued before this court that impasse should not be considered an unusual circumstance. *NLRB v. Hi–Way Billboards, Inc.*, 500 F.2d 181 (5th Cir. 1974). In *Hi–Way Billboards*, we stated that we were impressed by the cogency of the Board's reasoning on this point. We declined to enforce the Board's order in that case, however, because while we felt that the Board's position would be fair in protecting the interests of the union and the companies' employees, we were not convinced that it would be fair to the employers in the unit. The unfairness, however,

---

4. *See, e.g., Milwaukee Independent Meat Packers Ass'n*, 223 N.L.R.B. 922, 924 (1976); *Rock Springs Retail Merchants Ass'n*, 188 N.L.R.B. 261, 261–62 (1971); *Broward County Launderers & Cleaners Ass'n*, 125 N.L.R.B. 256, 257 (1959); *Chicago Metropolitan Home Builders Ass'n*, 119 N.L.R.B. 1184, 1186 (1957).

5. *See, e.g., McAx Sign Co. v. NLRB*, 576 F.2d 62, 66–68 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *NLRB v. Beckham, Inc.*, 564 F.2d 190, 192 (5th Cir. 1977); *Taylor Motors, Inc.*, 241 N.L.R.B. No. 113 (Apr. 3, 1979).

did not inhere in the Board's position that impasse does not constitute an unusual circumstance under its *Retail Associates* rules. Rather, the perceived unfairness was the result of another aspect of those rules, namely, that the Board permitted a union to negotiate separate final agreements with individual employer members of the multiemployer unit. We felt that this was tantamount to allowing the union to withdraw from the multiemployer unit, at least with respect to those individual employers. For the Board to then deny to the other employers a similar right of unilateral withdrawal did not accord with the Board's espoused commitment to applying to both employers and unions the same rules concerning the right to withdraw. *See generally Evening News Association*, 154 N.L.R.B. 1494, 1495–97 (1965), *enforced sub nom. Detroit Newspaper Publishers Association v. NLRB*, 372 F.2d 569, 570–71 (6th Cir. 1967).

In the last two years, the Board has issued a series of decisions, including its decision in the instant case, dealing with attempted withdrawals from multiemployer units.[6] In these decisions, the Board has specifically addressed the concerns articu-

lated by this court in *Hi–Way Billboards* and has clarified its prior decisions in the light of those concerns.[7] First, the only separate agreements that the Board will permit are temporary or interim agreements pending the outcome of negotiations in the multiemployer unit.[8] Second, the execution of a final separate agreement by a union and an individual employer of the multiemployer unit is violative of section 8(b)(3), 29 U.S.C. § 158(b)(3) (1976), by the union and of section 8(a)(5) by the employer, unless all parties–the union, the employer, and the employer association–consent to the agreement.[9]

## III.

With the above modifications, the Board has reaffirmed its position that withdrawal at impasse violates the employer's duty to bargain under section 8(a)(5) of the Act. The Board now asks us to reconsider our position taken in *Hi–Way Billboards*, in the light of the Board's recent clarifications of its *Retail Associates* rules. We have undertaken that reconsideration and we conclude that the Board has wisely weighed the competing policy concerns.[10] The Board's rules

---

6. *See, e.g., Tobey Fine Paper of Kansas City*, 245 N.L.R.B. No. 181 (Sept. 28, 1979), *application for enforcement docketed*, No. 79–1840 (8th Cir. Oct. 4, 1979); *Callier's Custom Kitchens*, 243 N.L.R.B. No. 143 (Aug. 6, 1979), *enforced on alternate ground*, 630 F.2d 595 (8th Cir. 1980); *Charles D. Bonanno Linen Serv.*, 243 N.L.R.B. No. 140 (Aug. 6, 1979), *enforced*, 630 F.2d 25 (1st Cir. 1980).

7. These same concerns have been expressed by other circuits as well. *See NLRB v. Independent Ass'n of Steel Fabricators*, 582 F.2d 135, 146 (2d Cir. 1978); *NLRB v. Beck Engraving Co.*, 522 F.2d 475, 482–83 (3d Cir. 1975); *NLRB v. Associated Shower Door Co.*, 512 F.2d 230, 232 (9th Cir.), *cert. denied*, 423 U.S. 898, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975); *Fairmont Foods Co. v. NLRB*, 471 F.2d 1170, 1172, 1174 n.1 (8th Cir. 1972).

8. The Board properly distinguishes between interim separate agreements and final separate agreements. Since interim agreements create only temporary arrangements pending the outcome of the group negotiations, ordinarily they do not fragment or destroy the multiemployer unit. Permanent agreements, on the other hand, may well do so, since they are not dependent on the outcome of the group negotia-

tions but rather establish terms and conditions of employment different from those established in the group contract. Thus, while interim separate agreements are legitimate economic weapons in the multiemployer context, final separate agreements are not. *See Callier's Custom Kitchens*, 243 N.L.R.B. No. 143 (Aug. 6, 1979); *Charles D. Bonanno Linen Serv.*, 243 N.L.R.B. No. 140 (Aug. 6, 1979).

9. *Callier's Custom Kitchens*, 243 N.L.R.B. No. 143 (Aug. 6, 1979), *enforced on alternate ground*, 630 F.2d 595 (8th Cir. 1980); *Charles D. Bonanno Linen Serv.*, 243 N.L.R.B. No. 140 (Aug. 6, 1979), *enforced*, 630 F.2d 25 (1st Cir. 1980); *Teamsters Union Local No. 378 (Olympia Automobile Dealers Ass'n)*, 243 N.L.R.B. No. 138 (Aug. 6, 1979), *application for enforcement docketed*, No. 79–7683 (9th Cir. Dec. 26, 1979).

10. Following its recent clarification of its *Retail Associates* rules, the Board has met with some success in requesting other circuits to undertake this same reconsideration. *NLRB v. Charles D. Bonanno·Linen Serv.*, 630 F.2d 25 (1st Cir. 1980), *enforcing* 243 N.L.R.B. No. 140 (Aug. 6, 1979). *Contra, H&D, Inc. v. NLRB*, 633 F.2d 139 (9th Cir. 1980), *denying enforcement of* 240 N.L.R.B. No. 161 (Mar. 3, 1979).

balance an individual party's legitimate interest in striking its own separate bargain against the parties' and the public's legitimate interest in achieving the benefits afforded by continued multiemployer bargaining, including avoiding the industrial strife likely to result from frustration of the bargaining process. In reaching this balance, the Board is treating both unions and employers equally and fairly. The Board permits each to use all available economic weapons in aid of reaching an overall settlement. On the other hand, the Board prohibits each from taking action that is destructive of the multiemployer unit: unions may not seek to negotiate separate permanent agreements with employers, and employers may not withdraw from the unit and seek separate permanent negotiations with the union. This result is well within the Board's broad discretion to resolve the inevitable questions arising in the multiemployer bargaining context. *See NLRB v. Truck Drivers Local Union No. 449 (Buffalo Linen),* 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). Accordingly, the application for enforcement in granted.

ENFORCED.