659 F.2d 841
 107 L.R.R.M. (BNA) 2221, 91 Lab.Cas. P 12,701
 TOBEY FINE PAPERS OF KANSAS CITY, Division of Distribix,
Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Teamsters Local No. 955, affiliated with the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
and Helpers of America, Intervenor-Respondent.
GRAHAM PAPER COMPANY, Division of Jim Walter Paper, Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Teamsters Local 955, affiliated with the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
and Helpers of America, Intervenor-Respondent.
BUTLER PAPER COMPANY, Division of Great Northern Nekoosa
Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Teamsters Local No. 955, affiliated with the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
and Helpers of America, Intervenor-Respondent.
 Nos. 79-1840, 79-1872 and 79-2000.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1980.
Decided April 20, 1981.
 
 Timothy L. Stalnaker, St. Louis, Mo., for petitioner, Tobey Fine Papers of Kansas City, Division of Distribix, Inc.; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., of counsel.
 Larry W. Joye, Kansas City, Mo., for intervenor-respondent Teamsters Local No. 955.
 William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson, Atty., N.L.R.B., Lafe Solomon (argued), Washington, D.C., for N.L.R.B.
 Berens & Associates, P. C., Kelvin C. Berens (argued), Omaha, Neb., for petitioner Butler Paper Co.
 Before LAY, Chief Judge, and BRIGHT and McMILLIAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 Tobey Fine Papers of Kansas City, Graham Paper Company and Butler Paper Company separately petition this court for review of an order of the National Labor Relations Board finding that the petitioners violated section 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1), (5). The Board held that petitioners were guilty of unfair labor practices by refusing to honor collective bargaining agreements negotiated by the Paper Industry of Kansas City, a multiemployer bargaining association to which each company belonged.[1] The Board found petitioners had made an untimely and ineffective withdrawal from the multiemployer collective bargaining negotiations because their withdrawals occurred after negotiations had begun and were not justified by "unusual circumstances." Petitioners urge that each of their withdrawals were motivated by an impasse in negotiations which constituted, as a matter of law, "unusual circumstances" justifying unilateral withdrawal. Alternatively, petitioners urge that the bargaining unit was fragmented by the withdrawal, with Union consent, of two members of the association and the Union's execution of separate agreements[2] with the two companies. In each case, the Board cross-petitions for enforcement of its order.
 
 
 2
 We enforce the Board's order in each case on a limited ground; we find substantial evidence on the record as a whole sustaining the Board's finding that the actual reason for each company's withdrawal was not based upon impasse or fragmentation, but on the fact that the employees of the individual companies expressed a doubt as to the Union's representation of a majority of each company's employees. It is well settled that this constitutes an impermissible reason for a company to withdraw from multiemployer bargaining. See NLRB v. Sheridan Creations, Inc., 357 F.2d 245, 248 (2d Cir. 1966).
 
 
 3
 Petitioners urge that their motivation for withdrawing from the bargaining unit was that contract negotiations had reached an impasse and the Union had executed separate agreements with Bermingham & Prosser and Nationwide Papers, the largest employer of the group. The Union and association met three times to negotiate a new contract before June 1, 1978, the date the existing contract expired. No agreement was reached and the Union struck all association employers on June 6. On June 8, Bermingham & Prosser withdrew from the association with Union consent and reached a separate agreement with the Union on June 26, 1978. On July 25, one week after the only negotiation session held since the strike began, Nationwide Papers withdrew, with Union consent, from the association and signed an agreement on July 31, 1978. After the withdrawal of Bermingham & Prosser and Nationwide Papers the number of employees in the bargaining unit declined from 130 to 75 members. On August 11, Tobey and Graham notified the Union and the association that they were withdrawing from the association. On August 14, Butler also informed the Union it had withdrawn from the association. The Union refused to consent to these withdrawals. Subsequently, the original wage package tendered to the Union by the association was resubmitted to the 75 employees remaining after the withdrawal of Bermingham & Prosser and Nationwide Papers. On August 25, the wage package was approved by a vote of 19 to 12 and a contract between the association and the Union was subsequently signed. Tobey, Graham and Butler have refused to recognize or bargain with the Union or to execute or abide by the agreement.
 
 
 4
 Petitioners urge that it is the overwhelming law of the circuits that an employer may withdraw from a multiemployer group once an impasse has been reached, citing NLRB v. Independent Association of Steel Fabricators, Inc., 582 F.2d 135 (2d Cir. 1978); NLRB v. Beck Engraving Co., 522 F.2d 475 (3d Cir. 1975); NLRB v. Associated Shower Door Co., 512 F.2d 230 (9th Cir. 1975); and NLRB v. Hi-Way Billboards, Inc., 500 F.2d 181 (5th Cir. 1974). Petitioners also rely upon the dicta in Fairmont Foods Co. v. NLRB, 471 F.2d 1170, 1172 (8th Cir. 1972), that an impasse was an "unusual circumstance" justifying unilateral withdrawal.[3] This rule has had recent reappraisal by the Board and at least three courts of appeals. For reasons discussed, we need not pass on the impasse issue. However, because of the importance of the issue, we think it helpful to point out the reasons we feel it best to resolve the issue at a later date.
 
 
 5
 The Ninth Circuit recently reaffirmed its earlier position taken in Associated Shower Door and commented that "Courts of Appeals have consistently recognized an impasse in negotiations as justification for a unilateral withdrawal from a multi-employer unit." H&D, Inc. v. NLRB, 633 F.2d 139, 142 (9th Cir. 1980), quoting Authorized Air Conditioning Co. v. NLRB, 606 F.2d 899, 907 (9th Cir. 1979). The Ninth Circuit, however, did not discuss Charles D. Bonanno Linen Service, Inc. v. NLRB, 630 F.2d 25 (1st Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981), which questioned the right of an employer to withdraw simply on the basis of an impasse reached in negotiations. The First Circuit in Bonanno thoroughly analyzed the policy background involved in the controversy and adopted the Board's position that without evidence of fragmentation or of an intent by the Union to destroy the bargaining unit, an impasse in negotiations, standing alone, is not a sufficient basis for an employer's unilateral withdrawal. Id. at 35. In Bonanno, unlike the present case, no separate agreements were consensually reached after impasse between the Union and withdrawing employers.
 
 
 6
 As recently as January 30, 1981, the Fifth Circuit has reevaluated its position taken earlier in Hi-Way Billboards. NLRB v. Marine Machine Works, Inc., 635 F.2d 522 (5th Cir. 1981). In Hi-Way Billboards, the Fifth Circuit declined to adopt the Board's reasoning that impasse alone could not constitute an "unusual circumstance" justifying unilateral withdrawal. The court perceived that it was unfair to employers for the Board to allow the union to negotiate separate agreements with the individual employer members of the association, and in effect withdraw from the multiemployer bargaining at least with respect to those employers, and not to allow the remaining employers a similar right of unilateral withdrawal.[4] 500 F.2d at 183-84. In Marine Machine Works, the Fifth Circuit observed the Board had recently addressed the unfairness perceived in Hi-Way Billboards in two ways. First, "the only separate agreements that the Board will permit (a union and employer to enter into) are temporary or interim agreements pending the outcome of negotiations in the multiemployer unit." 635 F.2d at 525. Second, "the execution of a final separate agreement by a union and an individual employer of the multiemployer unit is violative of section 8(b)(3), 29 U.S.C. § 158(b)(3) (1976), by the Union and of section 8(a)(5) by the employer, unless all parties the union, the employer, and the employer association consent to the agreement." Id. (citing Callier's Custom Kitchens, 243 N.L.R.B. No. 143, enf'd on other grounds, 630 F.2d 595 (8th Cir. 1980); Charles D. Bonanno Linen Service, Inc., 243 N.L.R.B. No. 140, enf'd, 630 F.2d 25 (1st Cir. 1980); Teamsters Union Local No. 378 (Olympia Automobile Dealers Ass'n), 243 N.L.R.B. No. 138, enf. pending, No. 79-7683 (9th Cir. argued Nov. 5, 1980)).
 
 
 7
 Under these circumstances, the Fifth Circuit now holds:
 
 
 8
 The Board's rules balance an individual party's legitimate interest in striking its own separate bargain against the parties' and the public's legitimate interest in achieving the benefits afforded by continued multiemployer bargaining including avoiding the industrial strife likely to result from frustration of the bargaining process. In reaching this balance, the Board is treating both unions and employers equally and fairly. The Board permits each to use all available economic weapons in aid of reaching an overall settlement. On the other hand, the Board prohibits each from taking action that is destructive of the multiemployer unit: unions may not seek to negotiate separate permanent agreements with employers, and employers may not withdraw from the unit and seek separate permanent negotiations with the union. This result is well within the Board's broad discretion to resolve the inevitable questions arising in the multiemployer bargaining context.
 
 
 9
 635 F.2d at 525-26.
 
 
 10
 One of the decisions relied upon by the Fifth Circuit is the Board's opinion in Teamsters Union Local No. 378 (Olympia Automobile Dealers Ass'n) 243 N.L.R.B. No. 138, enf. pending, No. 79-7683 (9th Cir. argued Nov. 5, 1980). In Olympia Automobile Dealers, the Board, for the first time, held that an employer may not withdraw from a multiemployer unit without the permission of the association.
 
 
 11
 Assuming that the Fifth Circuit's understanding of the Board's position is correct, that is, separate permanent agreements may no longer be entered into, and the Olympia Automobile Dealers decision is enforced,[5] it would appear that few controversies concerning unilateral withdrawal from multiemployer bargaining by employers will hereafter arise.[6]
 
 
 12
 Although both the Board and petitioner urge the issue is before us and although strong policy considerations seemingly support the Fifth Circuit's recent analysis, nevertheless, we find the issues not easily resolved.[7] We are concerned with the fact that the Board has evidently taken different positions before this court in Tobey, where the Board apparently approved negotiation of separate contracts between the Union and two employers that had withdrawn, and before the Fifth Circuit in Marine Machine Works, where the Board represented that only temporary, interim contracts would be approved by the Board. We note as well that certiorari is now granted in Bonanno.
 
 
 13
 Under these circumstances, rather than speculate over the Board's future policy or as to the Supreme Court's analysis of Bonanno, we elect to decide this case on the Board's narrow, alternative holding.
 
 
 14
 For over 20 years each of the petitioners belonged to the Paper Industry of Kansas City during which time the association had entered into successive collective bargaining agreements with Teamsters Local No. 955, the most recent of which was to expire on June 1, 1978. After negotiations of a new contract failed to bring about agreement, the members authorized an economic strike which the union members commenced on June 6, 1978, against all of the association members. Six of the eight employees employed by Tobey as well as six of eight employees of Graham struck their employers. Eight of Butler's employees also joined the strike.
 
 
 15
 After Nationwide Papers withdrew from the association, with Union approval, on July 25 and reached a separate agreement with the Union on July 31, Tobey, Graham, and Butler received statements from a majority of their respective employees stating they no longer wished to be represented by the Union. Both Tobey and Graham received these statements from their employees on August 11, the same day they each filed representation petitions with the Board's regional office in Kansas City and notified the Union and association, by telegram, that they were withdrawing from the association. Each stated their reason for withdrawing was because their employees no longer wished to be represented by the Union. On July 31, Butler received a statement signed by its eight employees stating that they wished to resign from the Union and wanted "the opportunity to vote the union out." Butler filed a representation petition on August 9 and on August 14 Butler notified the Union of its withdrawal stating its reasons for withdrawal were "changed circumstances and a management decision made at our headquarters."
 
 
 16
 Under our decisions, the Board is directed to base the validity of an employer's withdrawal from multiemployer bargaining on the actual motivation for the company's withdrawal. NLRB v. Custom Wood Specialities, Inc., 622 F.2d 381, 385 (8th Cir. 1980). There is no dispute that an employer's withdrawal predicated on loss of the union's majority status among its employees does not justify withdrawal. NLRB v. Sheridan Creations, Inc., 357 F.2d 245, 248 (2d Cir. 1966). A union's majority status must be tested by the multiemployer unit and not on an individual employer basis. The Board found "that the concurrent withdrawals (of Tobey, Graham and Butler) and filings of representation petitions were, in each case, expressly tied to an expression of doubt as to the Union's majority support among the respective employees." The Board relied on this finding to support its conclusion that Tobey's, Graham's and Butler's withdrawals from the association were untimely.
 
 
 17
 Petitioners argue that we can ignore the stated reasons for their withdrawals and view the overall circumstances which indicate the real reason for their actions. They urge their withdrawals were motivated by the impasse in negotiations and the subsequent fragmentation caused by the withdrawal of Bermingham & Prosser and Nationwide Papers and their negotiation of separate agreements with the Union. Even if we assume that petitioners are not indulging in hindsight reasoning, and it is indeed difficult for us to do so, we nonetheless cannot ignore the factual findings made by the Board based on the petitioners' telegrams sent on August 9 to the association. We cannot substitute our judgment for the Board's where substantial evidence on the record as a whole supports the Board's findings. We find that substantial evidence on the record as a whole sustains the findings of the Board as to the actual motivation of Tobey and Graham for withdrawing and, therefore, reject their contentions.
 
 
 18
 Butler urges that it stands in different shoes than Tobey and Graham. It states that it did not rely on the changed attitude of its employees in deciding to withdraw from the association. The Board found otherwise. The Board reasoned that negotiations had been at an impasse for more than two months, and Bermingham & Prosser had withdrawn a month before and these were not "changed circumstances." The Board concluded that the "changed circumstances" were the July 31 letter from the former union steward saying all of Butler's employees no longer wished to be represented by the Union and Butler's filing of a petition for a representation election on August 9. The Board fortified its conclusion by the fact that Butler withdrew from the association on the same day the representation petition was filed.
 
 
 19
 Here again, we must give credence to reasonable inferences drawn by the Board and must support the Board's findings if they are supported by substantial evidence on the record as a whole. We conclude that the record as a whole supports the Board's finding that Butler's withdrawal was motivated by a doubt as to the Union's majority status among its employees.
 
 
 20
 There is another even more cogent reason on this appeal why we feel compelled to enforce the Board's finding against Butler. Butler agreed to have its case before the Board presented on a stipulated record. Unlike Tobey and Graham it did not file a brief with the Board nor did it seek to have the Board reconsider its findings. Its claim that the record does not support the Board's finding as to the reason for withdrawal is raised here for the first time. It is difficult for us to understand that Butler makes a good faith contention when it did not attempt to resist the brief of the General Counsel made before the Board as to the actual motivation for Butler's withdrawal. Butler's reasoning is not only after-the-thought, it simply cannot be properly considered at this time. See 29 U.S.C. § 160(e); International Ladies' Garment Workers' Union v. Quality Manufacturing Co., 420 U.S. 276, 281 n.3, 95 S.Ct. 972, 975 n.3, 43 L.Ed.2d 189 (1975); Glaziers' Local No. 558 v. NLRB, 408 F.2d 197, 202-03 (D.C.Cir.1969).
 
 
 21
 We thus find the actual motivation for the withdrawal of Tobey, Graham and Butler was based upon their employees' desire to withdraw from the Union. This does not justify unilateral withdrawal. Under the circumstances, the Board's order finding that each of the petitioners violated sections 8(a)(5) and (1) is enforced.
 
 
 
 [1]
 The factual background of the dispute is set forth in the Board's three opinions. Tobey Fine Papers of Kansas City, 245 N.L.R.B. No. 181 (1979); Graham Paper Co., 245 N.L.R.B. No. 180 (1979); and Butler Paper Co., 245 N.L.R.B. No. 182 (1979)
 
 
 [2]
 Separate agreements are final contracts between the union and employers which are completely independent of any agreement that may be reached later between the union and association. Interim agreements are temporary contracts which govern the employee-employer relationship between the time a previous contract expires and the time a new contract is negotiated by the union and the association. By the terms, the interim agreement adopts the language of and is superseded by any subsequent contract between the union and association
 
 
 [3]
 The First Circuit in NLRB v. Charles D. Bonanno Linen Service, Inc., 630 F.2d 25, 30 & n.7 (1st Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981), notes that Fairmont Foods relied on the Board's prior decisions in Ice Cream Council, Inc., 145 N.L.R.B. No. 71 (1964), and Morand Bros. Beverage Co., 91 N.L.R.B. No. 58 (1950), enf. in part, 190 F.2d 576 (7th Cir. 1951). The First Circuit correctly points out that Ice Cream Council approved withdrawal only upon union consent. Id. It further distinguishes Morand Bros., which provided employers "unlimited freedom" to withdraw "at any time ... at their will or fancy," as abandoned by the Board in Retail Associates, Inc., 120 N.L.R.B. No. 66 A (1958). Id. In any event, the Board made its position clear in Hi-Way Billboards, Inc., 206 N.L.R.B. No. 1 (1973), enf. denied, 500 F.2d 181 (5th Cir. 1974), that it no longer recognizes the right of an employer to withdraw from a multiemployer group solely on the basis of an impasse in the negotiations. Since the dicta in Fairmont Foods relied primarily on what this court perceived to be the Board's policy and in view of the change of this policy, Fairmont can no longer be considered controlling in this circuit
 
 
 [4]
 As the court stated:
 (T)he Board permitted a union to negotiate separate final agreements with individual employer members of the multiemployer unit. We felt that this was tantamount to allowing the union to withdraw from the multiemployer unit, at least with respect to those individual employers. For the Board to then deny to the other employers a similar right of unilateral withdrawal did not accord with the Board's espoused commitment to applying to both employers and unions the same rules concerning the right to withdraw. See generally, Evening News Association, 154 N.L.R.B. 1494, 1495-97 (1965), enforced sub nom. Detroit Newspaper Publishers Association v. NLRB, 372 F.2d 569, 570-71 (6th Cir. 1967).
 Marine Machine Works, 635 F.2d at 525.
 
 
 [5]
 Olympia Automobile Dealers specifically allows negotiation of interim agreements without association consent
 
 
 [6]
 One difficulty remains. We find the Board's position still somewhat equivocal as to the impropriety of the union to enter into separate permanent contracts with withdrawn employers. Apparently the Board represented to the Fifth Circuit, in Marine Machine Works, that it would not allow unions to enter into permanent contracts. The court relied upon this representation along with the Board's decisions in Callier and Bonanno in deciding to change the position it had taken in Hi-Way Billboards. However, in Tobey Fine Papers, decided shortly after Callier and Bonanno, the Board said that separate permanent contracts are not per se unacceptable to the Board. The Board observed:
 In our recent Bonanno decision, we reexamined the impact of a bargaining impasse upon multiemployer negotiations in light of its potential as an affirmative device to aid in achieving agreement and we reemphasized that parties have great leeway during impasse, absent proof of unlawful motivation, to exert concurrent economic pressure upon each other. We also concluded that the negotiation of individual "interim" agreements during impasse may prevent, rather than cause, significant multiemployer unit fragmentation. Respondent herein in essence contends that the Union's negotiation of final, separate agreements establishes its unlawful motivation and per se created new withdrawal rights in Respondent, and in Butler and Graham. In our view, it does not follow ipso facto that execution of individual separate final contracts with former Association members either proves an intention to destroy, or necessarily causes the fragmentation of, a multiemployer unit. Rather, the facts of each case must be assessed in order to ascertain the impact of the parties' conduct upon the continued viability of multiemployer bargaining.
 
 
 [245]
 N.L.R.B. No. 181 (1979)
 
 
 [7]
 Although we recognize the expertise of the Board in these matters and the deference accorded its decisions, the Board's interpretation of labor policy is not unreviewable. The Supreme Court in NLRB v. Insurance Agents Int'l Union, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960) said,
 We recognize without hesitation the primary function and responsibility of the Board to resolve the conflicting interests that Congress has recognized in its labor legislation. Clearly, where the "ultimate problem is the balancing of the conflicting legitimate interests" it must be remembered that "The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." ... But recognition of the appropriate sphere of the administrative power here obviously cannot exclude all judicial review of the Board's actions.... Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked.
 In the multiemployer bargaining context the Supreme Court said,
 Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of judgment as to the proper balance to be struck between conflicting interests, "(t)he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. Labor Board, (380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965))....
 Congress has not given the Board untrammelled authority to catalogue which economic devices shall be deemed freighted with indicia of unlawful intent.
 NLRB v. Brown, 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).